EMENS v. LEHIGH VALLEY R. CO.

(District Court, N. D. New York. January 25, 1915.)

1. RAILROADS ⬤⟜350—ACTION FOR INJURY AT CROSSING—QUESTIONS FOR JURY.
Where the testimony in an action for injury to persons riding in an automobile, which was struck by a train at a railroad crossing, was in direct conflict as to whether any signals by bell or whistle were given by the train prior to the danger signal immediately before the collision, a substantial number of witnesses, some of whom were disinterested, testifying positively that no such signals were given, while the trainmen and some passengers testified that they were given, the question was one for the jury, and their finding thereon will not be disturbed.
[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. ⬤⟜350.]

2. RAILROADS ⬤⟜346—ACTION FOR DEATH OF PERSON STRUCK AT CROSSING—CONTRIBUTORY NEGLIGENCE—PRESUMPTION.
The presumption is that a person struck and killed on a railroad crossing looked and listened, and, in an action against the railroad company to recover for the death, the burden of establishing contributory negligence by showing that the deceased did not look or listen is on the defendant.
[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1117–1123; Dec. Dig. ⬤⟜346.]

3. RAILROADS ⬤⟜348—INJURY AT CROSSING—CONTRIBUTORY NEGLIGENCE.
A finding by a jury that a passenger in an automobile, who was killed at a railroad crossing, was not chargeable with contributory negligence, held sustained by the evidence, where it was shown that others in the car looked and listened continuously after reaching a point 700 or 800 feet from the crossing, and once stopped for that purpose, but neither saw nor heard a train; that· all were strangers to the locality; that the view of the tracks, until within, a very few feet of them, was to a very large extent obstructed by an orchard, fences, and other structures; and that the train gave no signals by bell or whistle and was running downgrade, with the steam shut off.
[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1138–1150; Dec. Dig. ⬤⟜348.]

4. RAILROADS ⬤⟜301—PUBLIC CROSSINGS—MUTUAL RIGHTS AND DUTIES.
Both those on a railroad train and those traveling on a crossing highway have a legal right to pass over the point of crossing and to require

⬤⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

due care on the part of the others. While the railroad train has the preference and the right of way, it is bound to give warning of its approach, and such warning must be reasonable and timely; and, on the other hand, those crossing a railroad track are bound to exercise ordinary care to ascertain whether a train is approaching.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 956; Dec. Dig. ☞301.]

5. RAILROADS ☞350—INJURY AT CROSSING—CONTRIBUTORY NEGLIGENCE.

A person driving or riding in an automobile, a stranger to the locality, who, on approaching an intricate railroad crossing at an angle of 17½ degrees, the intricacies of the crossing being unknown to him, stops at a distance of 150 feet from the crossing and within 50 feet in a direct line from the tracks and looks and listens and hears no train or signal, no signal being given, and who then proceeds at reasonable speed, continuing to look, and listen without seeing or hearing any train until it is upon him from behind, running downgrade without steam on, cannot be charged with contributory negligence, as matter of law, in not again stopping, there being nothing in the situation known to him to impress him with a doubt of the propriety of going forward.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. ☞350.]

6. EVIDENCE ☞122—RES GESTÆ—EXCLAMATION OF THIRD PERSONS—RESTRICTION TO SPECIAL PURPOSE.

On the issue as to whether or not the engineer of a railroad train sounded the signals for a crossing upon which the train struck an automobile, a witness, who with his wife was standing near the track and in view of both the train and the approaching automobile, testified that the signals were not given. On cross-examination it was sought to show that his attention was not, or might not have been, on the matter of signals. *Held,* that on re-examination it was proper to permit the witness to state an exclamation by his wife, "Why don't the train whistle," as showing that his attention was particularly called to the subject; the jury being told that the exclamation was not to be considered as evidence on the issue.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 339–350; Dec. Dig. ☞122.]

7. RAILROADS ☞320—ACCIDENTS AT CROSSINGS—FAILURE TO GIVE SIGNALS—PRECAUTIONS AS TO PERSONS SEEN AT CROSSING.

Those in charge of a rapidly moving railroad train approaching a highway crossing without signals, and seeing and appreciating that a traveler at the crossing is not aware of his danger and is going in front of the engine, may not assume that he will see and stop or get out of danger in time, but it is their duty to signal at once and slacken speed, if reasonably possible.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1014–1016, 1019; Dec. Dig. ☞320.]

8. TRIAL ☞296—INSTRUCTIONS—ERROR CURED BY WITHDRAWAL.

A charge given to the jury on a particular subject, which on objection was withdrawn with the consent of plaintiff as not within the issues, and where the jury were plainly told to disregard it, and that plaintiff relied solely on other issues, *held* not prejudicial to defendant.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 705–713, 715, 716, 718; Dec. Dig. ☞296.]

9. DEATH ☞103—ACTION FOR WRONGFUL DEATH—DAMAGES.

Under Code Civ. Proc. N. Y. §§ 1903, 1904, which provide that the damages recovered in an action for wrongful death shall be for the exclusive benefit of the next of kin of the decedent, and that the damages "may be such a sum as the jury * * * deems to be fair and

just compensation for the pecuniary injuries, resulting from the decedent's death, to the person or persons for whose benefit the action is brought," where the age, sex, health, and general intelligence of the person killed, and his or her relation to, and relations with, the next of kin are shown, it is for the jury to determine what is fair and just compensation for their pecuniary injuries, and no strict or definite rules for the measure of such damages can be laid down by the court.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 141; Dec. Dig. ☞103.]

At Law. Action by Edgar A. Emens, as executor of the last will of Martha E. Emens, deceased, against the Lehigh Valley Railroad Company. On motion by defendant to set aside verdict and for new trial. Denied.

Hiscock, Doheny, Williams & Cowie, of Syracuse, N. Y., for plaintiff.

A. D. Jenney, of Syracuse, N. Y., for defendant.

RAY, District Judge. On the 28th day of August, 1910, Edgar A. Emens, Mrs. Edgar A. Emens, his wife, and Martha E. Emens, his sister, with Carl M. Kilmer, the chauffeur, were riding in an automobile and proceeding on the Lake Road, so called, a public highway in a direction generally somewhat east of north, and while crossing the tracks of the Lehigh Valley Railroad Company, this defendant, at what is known as the Swarthout Crossing, the rear end of the automobile was struck by an engine drawing a train of seven or nine cars running on said tracks in a direction somewhat west of north, and such automobile was partially demolished, the occupants thrown out, and all were more or less injured, but the two ladies received injuries from which they very soon thereafter died.

This action was brought by Edgar A. Emens, as executor of the last will and testament of the said Martha E. Emens, deceased, to recover the pecuniary damages, if any, sustained and recoverable by reason of the alleged wrongful act, neglect, or default of the defendant railroad company on the occasion referred to under the provisions of sections 1902 and 1903 of the Code of Civil Procedure of the state of New York, and which read as follows:

"Sec. 1902. Action for * * * Death by Negligence, etc.—The executor or administrator of a decedent, who has left, him or her surviving, a husband, wife, or next of kin, may maintain an action to recover damages for a wrongful act, neglect, or default, by which the decedent's death was caused, against a natural person who, or a corporation which, would have been liable to an action in favor of the decedent, by reason thereof, if death had not ensued. Such an action must be commenced within two years after the decedent's death."

"Sec. 1903. For Whose Benefit Recovery Had.—The damages recovered in an action, brought as prescribed in the last section, are exclusively for the benefit of the decedent's husband or wife, and next of kin; and, when they are collected, they must be distributed by the plaintiff, as if they were unbequeathed assets, left in his hands, after payment of all debts, and expenses of administration. But the plaintiff may deduct therefrom the expenses of the action, and his commissions upon the residue; which must be allowed by the surrogate, upon notice, given in such a manner and to such persons, as the surrogate deems proper."

Martha E. Emens had never married, and she left her surviving, as her sole next of kin, four brothers, said Edgar A. Emens, Olin E. Emens, Humboldt Emens, and Fred S. Emens, all of full age. The plaintiff alleged and alleges that the defendant railroad company was negligent on the occasion referred to in that it did not give adequate or suitable notice of the approach of its train, the train referred to, to this crossing, and that this failure on its part resulted in the collision, injuries, and death of Miss Emens referred to. The collision, injuries, and death were not questioned by the defendant, but it strenuously contends that: (1) The defendant was in no way negligent; (2) that the plaintiff's testatrix was herself guilty of contributory negligence. The defendant denied and denies that there was sufficient evidence of negligence to take the case to the jury, and alleged and alleges that the evidence showed contributory negligence, as matter of law. The defendant alleges error in that on all the evidence the case should not have been submitted to the jury, but a verdict directed for the defendant; (2) that there was prejudicial errors committed in the admission and rejection of evidence; and (3) that there were prejudicial errors in the charge of the court; and (4) that the damages awarded by the jury are excessive and not supported or justified by the evidence.

## The Situation.

As stated, speaking generally, the Lake Road, or highway, ran a little east of north until within about 15 or 20 feet of the westerly rail of the most westerly track of the railroad, when it turned rather sharply to the east to cross the railroad tracks. After crossing the tracks, it turns again to the north or northeast. The railroad bed and tracks run in substantially a straight line for at least a mile northerly from this Swarthout Crossing and about three-fourths of a mile southerly therefrom. The first station south is Valois and the first station north is Caywood. The grade from a point a little north of Valois descends until Caywood is reached, so that trains going north, or, as the railroad men say, on the "west-bound track," run on a downgrade. At the distance of three-fourths of a mile south of this crossing, and quite a distance northerly of Valois, there is a curve, but after rounding this curve, and for a distance of some more than 2,520 feet, a train running north on these tracks is in view of a person on the Swarthout Crossing or in the highway and within 50 feet of the most westerly rail of the railroad tracks. Seven hundred and fifty feet south of this Swarthout Crossing there is a crossroad running east and west and crossing the railroad tracks, and this crossroad intersects the Lake Road at a point about 800 feet southerly of the Swarthout Crossing and about 240 feet from the crossroad railroad crossing. It is seen that we have a triangular space formed by the crossroad for its base, the railroad tracks and embankment and the Lake Road as its two sides, and having its apex at the Swarthout Crossing. The Lake Road and the railroad tracks approach each other at an angle of 17½ degrees. At the Swarthout Crossing the railroad tracks and top of the embankment are about 6½ feet above the level of the highway (Lake Road) and at the crossroad crossing

some 9½ feet above. At the Swarthout Crossing the Lake Road fill, to make the crossing, commenced some 200 feet from the crossing, but the fill was not uniform, being more steep and abrupt just before coming to the rails, with a level place of some 13 feet after making the rise before reaching the westerly tracks. Within this triangular space are pear trees set in rows, and on the south side of the crossroad and between the Lake Road and the railroad embankment there were buildings and some apple trees. At the time of the accident there was a crossing sign at both these crossings, and the one at the Swarthout Crossing was visible to travelers on the Lake Road at all times after reaching the crossroad. There was a line of telegraph poles along the railroad. These trees were of such height at the time as to hide the railroad embankment from those in the automobile, except as a view might be caught through the openings between the trees. All the persons in this automobile were strangers to this locality. No one of them had traveled the road before. It was conceded all round that, as they approached the scene of the accident, they were conscious that they were in the vicinity of a railroad and a railroad crossing. However, of the perilous nature and character of the crossing they were necessarily ignorant. The Lake Road highway makes its sharp turn to the east to cross the tracks just before reaching the level space of 13 feet next the most westerly tracks; and hence the persons within the automobile were within 50 feet of the iron tracks when they attained a position where the automobile, having turned east, was at right angles with the tracks running north and south.

There were cattle guards and cattle guard fences on each side of these two highway crossings. This fence immediately south of the Swarthout Crossing was 93 feet from it, and the one immediately north of the crossroad crossing some 600 feet further south, and the other something like 200 feet further south. The crossing sign "Look out for the Cars" was south of the Lake Road and some feet from the most westerly railroad tracks. About halfway down to the other crossing stood a semaphore on the westerly side of the tracks. These cattle guard fences were some four feet in height and ran up to within a few feet of the tracks and were formed of boards nailed parallel to each other some six or eight inches apart on posts set in the ground. To a person sitting in an automobile and 50 feet from the westerly tracks at the Swarthout Crossing, and approaching them from the south, the cattle guard fences would obstruct a view of the line of rails more or less. In approaching the rails riding in an automobile, until the turn was fully made, to see back up the railroad tracks in the direction of the curve (that is, to the south), it was necessary to turn the head quite considerably, and, until out of line with them, the crossing sign post and semaphore would more or less interfere with or confuse the sight or view of any object beyond them and in the same line. Until the automobile made the sharp turn of the highway just before going upon the rails or the level space of 13 feet before reaching the rails, it was proceeding in substantially the same direction as the train. The two moving bodies were approaching the

apex of the triangle described, one on each of its sides, at the angle of 17½ degrees. Until the automobile ascended the fill at the Swarthout Crossing, it was lower down than the railroad tracks. The Swarthout house, with a stone stepping block in front, is 145 feet from the westerly rail of the west-bound track, where the collision occurred, or about 125 feet from the most westerly rail; that being the west rail of the east-bound track. At this point in a direct line it is 36 feet to the westerly rail. At a point 300 feet south from the crossing it is 89 feet in a direct line to the most westerly rail.

### The Speed.

The evidence was conflicting as to the speed of the automobile and also as to the speed of the train as they approached the Swarthout Crossing where the collision occurred.

Carl M. Kilmer, the chauffeur, said, in substance: That he had a speedometer and had been running at from 15 to 20 miles per hour all the way from Penn Yan, and continued that speed until they passed the east and west road, crossroad, when he threw out the clutch and threw the car out of gear, shut off the power, and drifted along under the momentum until they stopped in the vicinity of the Swarthout house. That they stopped entirely. He says:

"I looked both ways, and Mr. Emens looked both ways. Mr. Emens remarked to me—he said, 'I guess it is all right, Carl;' and I didn't say anything that I remember of. I looked again, and then threw the car into gear, and we started on. We started on towards the crossing, and ahead of us, of course, was this pitch that we had to make to get up on the tracks. And I continued to look all the way up to the tracks, first in one direction and then another. And I didn't observe anything—any reason why I should stop—so I kept on going. And when I got up over this little pitch here (pointing out the abrupt pitch in the highway), I looked again to my right. I had been looking, coming up the little pitch to the left, because that was the direction that the (later he said direction from which a train moving on the westerly tracks would come), and on reaching the top of the pitch I looked again to the right, and then it was I saw the train. I hadn't heard the train previous to that. I saw it before I heard it. The automobile, when I saw the train, was on the first track. I think it is given here as the east-bound track. I knew that I couldn't stop the car in time to change my gears and back off from the track then, now the train was coming. I knew that I couldn't stop the car in time to clear the train. I knew if I stopped at all it would be so close that I would have to back the automobile up in order to clear the train. So the only chance that I could see was to make an effort to get over before the train got to us. And that is what I did. The first part of the car got off the track. The engine of the train hit the rear of the car, and when it hit," etc.

The evidence of the engineer was: That back of the curve, and near Valois, he saw a signal (Hall signal), indicating caution. That he applied air to reduce speed then about 55 or 60 miles per hour, and was decreasing some. That he blew the crossing signals for the "crossroad" crossing and also for the Swarthout Crossing. That he saw a red automobile with a man in the highway and a lady in the auto at the crossroads crossing, and, when he saw they were safe, looked ahead to see what the Hall signal at Caywood said. It was set against him. That just before he looked for the Caywood signal, which was when he was about at the crossroad crossing, he noticed the automobile on

the Lake Road coming up the incline, not back by the Swarthout house, and it was going slow, and he thought it stopped or was about to stop. That he gave no alarm or danger signal then, but, after looking at the Caywood Hall signal and noticing it against him, he took his eyes from it, and then noticed this automobile on or coming on the east-bound tracks, the most westerly tracks, and then, appreciating danger, he pulled the bell and rang the whistle, alarm, or danger whistle signal, and put on all the air he could. That he could not then apply the emergency brakes for the reason he had exhausted part of his air back near Valois when he first reduced speed. That he saw the automobile shoot ahead, and then a cloud of smoke. He thought he was running at the rate of 40 or 45 miles per hour after or when passing the crossroad.

### Signal by Bell or Whistle.

[1] As just stated, the engineer testified to ringing the bell and blowing the regular crossing signals or whistle for both crossings.

Kilmer testified, not quoted above, that he listened but did not hear any bell or whistle. Mr. Emens, who was in the automobile by the side of Kilmer, testified that they very much slowed down before going up the slope, and that he looked and listened, and that he continued so to do, and heard no bell or whistle until the danger signal was given just before the automobile was struck, and saw no engine or train until that time. He says that no signals were given.

The plaintiff called several other disinterested witnesses, some of whom had their attention on the train and its signals, and some of whom did not have their attention on its signals especially, and these testified either that no bell was sounded and that no whistle was blown until the danger signal, or that, being in a position where they could and probably would have heard, heard none.

The defendant called the engineer, fireman, conductor, and quite a number of men who were on the special excursion cars attached to the train, and these testified that they observed and heard the crossing signals given. The evidence was of such a character that a question of fact for the jury was presented whether or not the crossing signals were given, and whether or not the bell was rung, or whether or not any signal of the approach of the train was given prior to the danger signal. A Mr. Granger with his wife had stopped in the highway (crossroad) but a few feet east of the railroad tracks, and saw the automobile approaching the Swarthout Crossing, and both saw and heard the train coming from the south and saw it as it passed and also the collision.

Mrs. Granger was asked:

"Q. Did you, as the automobile and train each approached the Swarthout Crossing, have in mind the question as to whether or not the train was giving signals? A. Yes, sir. * * * Q. Did you hear the danger signals? A. I did the danger signals. * * * Q. Did the train that killed these women give any signal as it approached this crossing from the time when it came around the curve until it gave the danger signals? * * * A. No, sir; it did not."

Mr. Granger said his attention was called to both the train and the automobile, and:

"Q. And did you see the train as soon as it came in sight around the curve? A. Yes, sir. * * * Q. Did it give any signal from the time it came around the curve until it gave that danger signal? A. No, sir."

He also testified that the automobile was going at the rate of about 15 miles an hour, and the train about 50 miles an hour, and that the danger signal was given when close on the automobile with which it collided. It was a still, quiet, sunshiny day. Mr. and Mrs. Granger, who apprehended the collision and were watching, and several other witnesses, testified that the danger signal and the crash of the collision came almost together. All on both sides described the danger signal as several short, sharp blasts, or "toot, toot, toot," in quick succession. The crossing signals were two long and one short blasts; hence there could be no mistaking the one for the other. Mr. and Mrs. Granger were both entirely disinterested.

More witnesses testified that the bell rang and the crossing signals were given for these crossings than testified the bell did not ring and that the crossing signals were not given, but there was a substantial number on each side, and it would be an abuse of discretion to set aside the verdict on the ground the evidence did not fairly establish negligence on the part of the defendant railroad company in failing to give signals of the approach of this train to this crossing. The jury was justified in finding negligence. Signals by a train on approaching a highway crossing serve a double purpose. They not only notify travelers on the highway of their approach but direct the attention of such travelers to the point or in the proper direction at which they are and from which their approach may be expected. Persons familiar with this crossing and accustomed to pass it know where to look and in what direction. They know the grade and curve and elevation of the track and would follow the line with the eye quickly, readily, and accurately. They know the objects along the railroad and near this crossing which would tend to confuse the sight of a stranger to the locality. They know that a train approaching on those tracks from the south will come head-on to one on or within 50 or 100 feet of the tracks, for something like three-fourths of a mile, and that the intervention of the Hall signal staff, or post sustaining the crossing sign, or the three cattle guard fences, two above the first, or on a higher elevation as you go south, or all together, would be liable to interfere with or confuse the traveler in getting a view of the on-coming train. Hence they know by experience where to look and from what point to look. To persons familiar with and accustomed to this crossing who should look, the giving of signals was of comparatively little consequence. But to strangers to the locality signals were all-important. Looking backward through the window in a curtain as you approached that crossing from the south, and before you made the sharp turn, Miss Margaret Swarthout, a witness antagonistic to the plaintiff, said, you would look into the dooryard or at the farm buildings at her brother's house. If, however, you knew the proper angle of vision and got it, you could see down the tracks to the curve after getting within 50

or 100 feet of the most westerly rail at the crossing. Mr. Kilmer, the chauffeur, and Mr. Emens and Miss Emens, the jury found, looked and listened and exercised due care in looking and listening before going upon those tracks. They heard nothing, did not hear the train, for the reason, as the jury found, that no signals were given. They saw nothing of the approaching train because of the peculiar and intricate nature of the crossing with its approaches. By the failure of the defendant to give signals, the parties in the automobile were not directed to the proper point for seeing the approaching train. This is what the jury found and must have found under the charge of the court. The jury found also, and must have found, under the charge of the court, that there was nothing in the conditions and surroundings at the crossing which impressed or which ought to have impressed the plaintiff's testatrix, Martha E. Emens, with a doubt whether it was safe to go forward, under all the circumstances and surroundings, and that she was justified in going forward and onto the tracks without actually stopping when closer to the tracks than the place where the stop was made; that is, within 50 feet or 100 feet or so of them. The jury also found, and under the charge of the court must have found, that the failure to give signals led or induced the plaintiff's testatrix to go upon the tracks or allow herself to be taken there.

The jury was plainly and explicitly told:

"When a traveler upon a highway reaches a steam railway track, and after looking and listening, which it is his duty to do, is impressed, or ought to be impressed, by what he sees or hears, with a doubt whether it is safe to go forward, he is chargeable with contributory negligence if he at once proceeds without using reasonable precaution to determine whether his doubt is well founded. And that applies here and would apply to these parties. You are to say what the truth and what the facts are. That is, if the existing surroundings and conditions, including what he hears, actually impress him, or ought to impress him, that there is or may be danger in proceeding, he should wait a reasonable time to ascertain whether or not the doubt he entertains, or ought to entertain, is well founded. So here, as to Miss Emens. Has it been proved in this case that she was negligent; that she ought to have been impressed from what she saw there, or heard, that it was unsafe to proceed, so that you can say she was guilty of contributory negligence in going upon the track at all, or allowing herself to be taken there. Proximate cause is that cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produced the result complained of, and without which that result would not have occurred. Therefore, if you find from the evidence in the case, all of it together, that the plaintiff's intestate, Martha E. Emens, and those in control of the automobile, exercised due care in looking and listening before going on the railroad tracks, and under the circumstances, surroundings, and conditions seen or known, or which ought to have been seen or known, in the exercise of due care, were not required to stop and do more than was done, and you also find that the failure of the railroad company, by its employés in charge of this train, if there was failure (and that is a question of fact for you to determine) to give warning signals in time, of the approach of this train to the crossing, or its failure to stop the train or slacken the speed on seeing the danger of those in the automobile, if that danger was seen and appreciated by those operating the train, was the proximate cause of this collision or accident, and of the consequent death of the plaintiff's intestate, and that the omissions of the defendant's employés was negligence on the part of the defendant, and you also find that negligent acts and conduct of those in charge of the automobile after going on the tracks did not intervene and cause the accident and the consequent injury, the defendant here, the Lehigh Valley Railroad Com-

pany, is liable, and you come to the question of damages. If the accident or collision and consequent injury to Miss Emens was the result of the negligence of the driver of the car, and his neglect, if any, in driving in front of the engine was the proximate cause, then the plaintiff here cannot recover, even if Miss Emens herself was not negligent at all. If you find that those in the automobile were free from negligence, under all the circumstances, in going on the railroad crossing, that the negligence of the employés of the defendant company in failing to give warning signals led those in the automobile onto the tracks, and so into a place of imminent peril from the approaching train, and that those in charge of the automobile then exercised their best judgment, and did the best they could to avoid and escape the danger and the impending collision, a mere mistake or error in judgment on the part of the driver of the car in not doing the very best thing, or in not pursuing some course other than and better than the one he did, will not defeat recovery by this plaintiff, even if the driver might have avoided the collision by adopting some other course of action or conduct. That is, in an emergency demanding prompt and immediate action when in a place of peril, into which place of danger a person has been led by the negligence of the defendant railroad company, such person is bound to exercise his best judgment under the circumstances and conditions then surrounding him; and if he does, and there are two courses that may be pursued, one of which will in fact avoid the collision, and the other not, but the safe course is not perfectly plain or obvious, and such person does the best he can, recovery of damages is not defeated for the reason that he errs in judgment in such emergency, and by reason of such error pursues the wrong or the dangerous course."

## Contributory Negligence.

Miss Martha E. Emens was a mere guest of Mr. and Mrs. Emens. They or one of them owned the car, were operating it, and Kilmer was hired and paid by them. But she, of course, was bound to exercise due care and look and listen and even stop, or cause the car to be stopped, if she heard or saw, or in the exercise of due care ought to have seen or heard, the approaching train. The two ladies occupied the back seat, and, as stated, the top was up, and the back curtain was down. Miss Emens could see the crossing ahead, but she was a stranger to the locality, had never been over the road, and was ignorant of the line and elevation of the tracks. She could get a dim view through the window in the back curtain and a backward view at the angle of $17\frac{1}{2}$ degrees. There was a point and points after getting within 100 feet of the crossing where a view could be obtained for some three-fourths of a mile back up the track, but she was ignorant of it, and she, as well as Mr. Emens and Mr. Kilmer, supposed they had a clear and proper view, and that no train was in sight. No crossing signal or signal of the approach of the train was given. The jury found that due and proper care was exercised in looking and listening, and that there was no negligence in not stopping nearer the tracks than the vicinity of the Swarthout block (where the stop was made), and that there were objects and conditions which confused the sight or view. Mr. Emens described the objects that confused the view:

"I had a clear view down the track. The view in the other direction was obstructed and confusing. Q. How? Mr. Jenney: That I ask to be stricken out, being obstructed, Mr. Williams. I don't think it ought to go out. He don't mean absolutely obstructed. He will detail in a minute. By the Court: I suppose he objects to the use of the word 'obstructed.' He may state what there was in the way. Q. Well, describe, if you please, what there was there, as you recollect, that in any way interfered with or confused you. A.

As I recollect there was a pear orchard, an orchard, trees; and I have a distinct remembrance of a gate, board gateway, that was at the place where the cowcatchers, or the— By the Court: Cattle guards, you mean. Witness: Cattle guards, I mean. Q. Now, Professor, how many times do you recollect looking? A. I recollect looking twice before the final look, and then before that I remember looking, and perhaps I might say looking continuously. Q. First one way and then the other? And you had your mind on the question that there was a crossing there? A. Absolutely. Q. And on the possibility of a train approaching? A. I did. Q. And did you see or hear that train before you saw it at the time you have described, about 300 feet away after your car was up at the tracks? A. I did not. Q. How far away do you say it was? A. I think it was about 300 feet. That is my recollection. Q. Now were you listening as you approached that crossing? A. I was. * * * Q. Now, Professor, when would you say, as you approached that crossing, you began to listen, began listening with reference to a train? A. Why, I should say it is 800 feet; is it not? Q. To that corner 805 feet, the surveyor says. A. Why I think soon after passing that point, I should say 700 or 800 feet. Q. And were you listening from that time on? A. I was on the alert. Q. Listening for signals? A. Yes. * * * Q. It was a still afternoon? A. It was. Q. And you could hear a bell or a whistle some distance? A. I could. Q. Could you hear them as far as the curve from you? A. Yes. Q. Now, from the time that you began paying particular attention, as you have described, shortly after or about the time of passing that corner, did this train, as it approached the crossing in question, give any signal either by bell or whistle? A. It did not. Q. And you mean by that prior to the danger signal? A. Prior to the danger signal."

[2] Miss Emens was killed in this collision and could not testify as to what she did by way of looking and listening. She had every incentive to do both, and there is no presumption or inference she did not. B. & O. R. Co. v. Griffith, 159 U. S. 603, 609, 16 Sup. Ct. 105; 40 L. Ed. 274. The burden of showing contributory negligence was on the defendant. Defendant was bound to show on the whole case that Miss Emens did not look or listen, and it is presumed she did look and listen. Baltimore & Potomac R. R. v. Landrigan, 191 U. S. 461, 474, 24 Sup. Ct. 137, 48 L. Ed. 262; Texas & Pacific R. Co. v. Gentry, 163 U. S. 353, 366, 16 Sup. Ct. 1104, 41 L. Ed. 186. In Baltimore v. Landrigan, supra, at pages 473, 474, of 191 U. S., at page 140 of 24 Sup. Ct. (48 L. Ed. 262), the court said:

"There was no error in instructing the jury that, in the absence of evidence to the contrary, there was a presumption that the deceased stopped, looked and listened. The law was so declared in Texas & Pac. R. Co. v. Gentry, 163 U. S. 353, 366 [16 Sup. Ct. 1104, 41 L. Ed. 186.]"

Nothing was said by any one after Mr. Emens said, "It looks all right, and I think we can go ahead," except just as Kilmer saw the train Mrs. Emens spoke his name. Did she see the train and speak to him for that reason?

This case in some of its aspects is similar to Schofield v. Chicago, Milwaukee & St. Paul Railway Co., 114 U. S. 615, 5 Sup. Ct. 1125, 29 L. Ed. 224, and in others entirely dissimilar. There the highway and railroad trains ran in the same general course, north and south, and both the plaintiff and the defendant's trains were going north. The highway was some 280 feet west of the railroad until they came opposite the crossing, when it turned east and crossed at a point 70 rods (1,130 feet) north of the depot at Newport. The country was

flat and open, and there were no intervening or confusing objects. The plaintiff was driving a slow traveling horse attached to a cutter.

"When he arrived at a point in the wagon road 600 feet from the crossing, he could there, and all the way from there until he reached the crossing, have an unobstructed view of the railroad track to the south, and of any train on it, from the crossing back to the depot; and, when he reached a point in the wagon road 33 feet from the crossing, he could have an unobstructed view to a considerably greater distance southward beyond the depot."

And, says the case, page 616 of 114 U. S., page 1126 of 5 Sup. Ct. (29 L. Ed. 224):

"The evidence showed that, if the train had passed the depot when the plaintiff was at a point 600 feet, or any less number of feet, from the crossing, he could not have failed to see the train, if he had looked for it; and that if the train had not reached the depot, when the plaintiff arrived at a point 33 feet from the crossing, he could not at that point, or at any point in the 33 feet, have failed to see the train beyond and to the south of the depot, if he had looked for it. When the train passed the depot, the plaintiff was at least 100 feet from the crossing. The train consisted of a locomotive engine and seven or eight cars. The engine whistled at a point 4,300 feet south of the depot, which was the whistling place for that depot. The wind was blowing strongly from north to south. * * * The plaintiff resided in the neighborhood, and was familiar with the crossing. * * * The train was not a regular one, and no train was due at the time of the accident; it was moving at a high rate of speed; it did not stop at the depot; and it gave no signal by blowing a whistle or ringing a bell after it passed the depot."

It is perfectly plain that the plaintiff in that case neither looked nor listened. Probably he assumed there was no danger from the fact that no regular train was due. There was nothing to obstruct or confuse the sight or view, and the plaintiff was perfectly familiar with the situation, and the country was flat and open. The strong north wind may have prevented his hearing the train, but it did not interfere with seeing it.

[3] In the case now before this court the steam was shut off. The train was gliding or "floating." There were confusing objects. The plaintiff and those in the automobile were strangers to the locality, not familiar with the crossing. No signals of approach were given, and those in the automobile both looked and listened continuously and stopped. They did not stop at the right place to get the best view and a clear view, but they did not know where that place was. There was nothing in the situation to impress them with a doubt that it was safe to proceed. If the crossing signals had been given, the accident would not have happened, as those in the automobile would have heard, would have seen, and would have stopped before reaching the tracks on which the train was moving. All this under the evidence was for the jury, and on each proposition it found for the plaintiff.

It was not necessarily negligence that the plaintiff's testatrix did not look at the precise place and time when and where looking would have been of the most advantage. Rodrian v. N. Y., N. H. & H. R. Co., 125 N. Y. 526, 529, 26 N. E. 741. The court said:

"If, in case of an accident at a crossing, it appears that the person injured did look for an approaching train, it would not necessarily follow, as a rule of law, that he was remediless, because he did not look at the precise place

and time when and where looking would have been of the most advantage. Many circumstances might be shown which could properly be considered by the jury in determining whether he exercised due and reasonable care in making his observation."

[4] The relative rights and duties of railroads at highway crossings and of persons crossing or desiring and attempting to cross were considered and determined by the Supreme Court of the United States in Continental Improvement Co. v. Stead, 95 U. S. 161, 164, 24 L. Ed. 403, and again in Baltimore & Ohio R. R. Co. v. Griffith, 159 U. S. 603, 608, 609, 16 Sup. Ct. 105, 40 L. Ed. 274, where the language of Mr. Justice Bradley in the first case was quoted and approved. We may summarize: (1) Those traveling on either road have a legal right to pass over the point of crossing and require due care on the part of those traveling on the other to avoid collision; (2) the railroad train has the preference and the right of way; (3) "but it is bound to give due warning of its approach, so that the wagon may stop and allow it to pass and to use every exertion to stop if the wagon is inevitably in the way, and such warning must be reasonable and timely." On the other hand, those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. Says the court:

"They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen; and hence it will not be presumed without evidence that they do not exercise proper care in a particular case. For, conceding that the railway train has the right of precedence of crossing, the parties are still on equal terms as to the exercise of care and diligence in regard to their relative duties. The right of precedence referred to does not impose upon the wagon the whole duty of avoiding a collision. It is accompanied with, and conditioned upon, the duty of the train to give due and timely warning of its approach. The duty of the wagon to yield precedence is based upon this condition. Both parties are charged with the mutual duty of keeping a careful lookout for danger; and the degree of diligence to be exercised on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring fairly to perform his duty."

The court, in the Griffith Case, 159 U. S. 610, 611, 16 Sup. Ct. 108, 40 L. Ed. 274, further says:

"Since the absence of any fault on the part of a plaintiff may be inferred from cirmustances, and the disposition of persons to take care of themselves and to keep out of difficulty may properly be taken into consideration (Railroad Co. v. Gladmon, 15 Wall. 401 [21 L. Ed. 114]), it is impossible to hold in the light of this evidence, as matter of law, that the conduct of plaintiff was such as to defeat a recovery. The rule was thus expounded by Mr. Justice Lamar in Grand Trunk Railway v. Ives, 144 U. S. 408, 417 [12 Sup. Ct. 679, 682 (36 L. Ed. 485)]: 'There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such that reasonable men.

may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

And it was not contributory negligence, as matter of law, not to stop nearer the tracks than the vicinity of the Swarthout block. Danskin v. Pennsylvania R. R. Co., 83 N. J. Law, 522, 83 Atl. 1006; Texas & Pac. R. Co. v. Cody, 166 U. S. 611, 612, 615, 17 Sup. Ct. 703, 41 L. Ed. 1132; Continental Im. Co. v. Stead, 95 U. S 161, 168 (24 L. Ed. 403). In this last case the court was requested to instruct the jury that:

"If by reason of the character of the ground or other obstructions, or if by reason of a defect in his sense of sight or of hearing, he cannot determine with certainty whether or not a train of cars is approaching without stopping, and, if necessary, going in advance of his team to examine, it is his duty to do so."

The Supreme Court said of this:

"Here is no assumption of facts as in the previous instruction; but it states the duty of persons approaching a railroad with wagons and teams in a more absolute and unqualified form than we think admissible. It states such duty with the rigidity of a statute, making no allowance for modifying circumstances or for accidental diversion of the attention, to which the most prudent and careful are sometimes subject, and assuming, in effect, that the duty of avoiding collision lies wholly, or nearly so, on one side."

[5] This court is of the opinion that a person driving an automobile, a stranger to the locality, who approaches a railroad crossing and stops, or substantially stops, at a point 145 or 150 feet from the actual crossing, being less than 50 feet in a direct line from such tracks, and looks and listens, exercising due and reasonable and ordinary care in so doing, hears no train and no signal, and no signal is given, and who then proceeds at reasonable speed, continuing to look and listen, and who neither sees nor hears the approaching train which is coming nearly head on behind him on a downgrade, gliding or floating at from 40 to 60 miles per hour without sounding bell or whistle, is not necessarily guilty of contributory negligence in not again stopping, or in failing to see or hear the approaching train. The same is true of one riding in such automobile, especially when the ground, with certain objects thereon, is such that there may be more or less difficulty in getting the correct line of vision for seeing the train. There may be errors of judgment and a miscalculation of locations, but this is not contributory negligence, if ordinary care, under the circumstances and surroundings, is exercised. Such a case presents a case for the consideration and determination of the jury.

### Rulings and Charge.

[6] When Mr. Granger was on the stand, and after he had given his direct examination for the plaintiff, he was cross-examined, and his attention was called to certain things which it was claimed tended to show that his mind or attention was not on the train and signals when and after it came around the curve. Then on redirect this occurred:

"By Mr. Williams: Q. Mr. Granger, they have asked you about the repairs that you ·were making to the automobile, as things that might have distracted your attention from this train and signals. And now I want to known if there was 'any particular thing that attracted your attention to the train and the signals? A. Yes, sir.

"By Mr. Jenney: I object to the question as leading, incompetent, and improper.

"By the Court: He may ask that, whether there was anything that attracted his attention to the train and signals, as I understood you; is that right?

"By Mr. Williams: Yes.  Q. What was it?  A. My wife called my attention to the train as it was coming around the bend.

"By Mr. Jenney: That I object to, as to what his wife said, and ask that it be stricken out.

"By the Court: No, he may answer.

"Q. And what next?  A. The next remark that was made—

"By the Court: Wait a minute.  If there is anything here that would tend to show any negligence, if anything said by his wife, I could not permit that.  As I understand, he started to say something that he wife said to him; is that it?

"By Mr. Williams: Yes.

"By the Court: If there was a conversation between him and his wife, while they saw the automobile approaching the crossing, and the train crossing the crossing, that riveted their attention to the fact that there were no signals given, I think it is competent.  Now, any expressions of opinion—

"By Mr. Williams: Oh, no; I don't want any expressions of opinion.

"By the Court:   —or statements that might imply negligence on the defendant's part—

"By Mr. Williams: I will not say that they might not imply negligence.

"By the Court: You seek to show some fact or facts, expression, or statement from the wife, I take it now, calling attention to the fact that signals were not given?

"By Mr. Williams: Yes, right there at the time, and before the accident; and when they knew the automobile was approaching, and the train approaching, and feared they would come right there at the same time.

"By the Court: You think, Mr. Williams, that you can go to the extent of showing what was said?

"By Mr. Williams: Yes, sir.  It is a remark made right at the time, as the train sped down the course, and the automobile approached the crossing, that riveted this man's attention to the fact as to whether or not signals were being given.  And I claim it is competent, as showing the reason why he can be so sure.

"By the Court: There isn't any doubt about the competency of the fact that she spoke to him.  If she called his attention to the signals, that fact, and that his attention was then riveted on the train, and he watched it, all that is competent.  The only point would be whether what she said was competent.  What she said might be harmless.

"By Mr. Williams: I am not trying to put it in under that deception, if your honor please, at all.  It is a serious matter, and an important matter, that I am discussing, and I want your honor to understand me, so that I will not be accused of fooling anybody.  If he said his wife called his attention to the fact whether the signal blew or not, of course that is somewhat of a conclusion, Mr. Jenney might claim.  I think it is competent.  I am not claiming it isn't; but it is competent, I claim, for me to show the ejaculation of his wife on the instant; the word she said, or words she said, that did rivet his attention on the signal.  It is just as competent to show it as it would be to show that this attention was called.

"By the Court: I will overrule the objection, and give you an exception.

"By Mr. Williams: I will write it out and send it up, if your honor would like me to.

"By the Court: I would rather know what it is.  (Mr. Williams handed to the court a written statement.)  Well, I will admit it, for the purpose of showing that his attention was called to the signals, that his mind was upon

it, and tending to show that his attention was on it. I will not admit it as proof of itself, as to the truth of the statement made at the time. The ejaculation, as proof that the whistle was not blown, that must depend on what they say about it. Tending to show that it is so near all one transaction, the whole thing, I will overrule the objection, and give an exception to the defendant.

"Q. And what next?

"By Mr. Jenney: I haven't stated my objection.

"By the Court: You may.

"By Mr. Jenney: Incompetent and improper, immaterial hearsay; reopening of the examination of the witness, and no part of the res gestæ.

"By Mr. Williams: It is offered as a part of the res gestæ in rebuttal, for the purpose of showing that his attention was attracted, and how. Not for the purpose of showing the fact.

"By the Court: I will admit it for that purpose, and that purpose only. And the ejaculation made by the wife must not be regarded by the jury as any proof that the bell did not ring, or that the whistle did not sound at that time, as they approached. That will have to depend upon the evidence of the witnesses. It is simply and purely for the purpose of showing that his attention was called at the time to the train, and to the fact of whether or not warnings were given. For that purpose, and that purpose only, I admit it. (Exception.)

"A. Make the question a little plainer, please; more definite. Q. What next called your attention to whether or not the train was giving signals?

"By Mr. Jenney: Same objection. (Overruled. Exception.)

"A. The next remark that was made after my attention was called to the train coming around the bend, saw the automobile, and this statement: 'Do you suppose the people in that automobile see the train?'

"By the Court: You may disregard that.

"Q. That isn't the one that I—— Well, go on.

"By the Court: Q. Did you look at the train as it approached? A. I did. Q. Now, Mr. Williams' proposition is that something was said by your wife in reference to signals. Did she say anything on that subject? A. She did. Q. That is what we want. I give you an exception Mr. Jenney, to all of this.

"Q. What did she say? A. After mentioning what I have already stated in regard to the automobile, we saw the automobile accident at the next instant. Then she said, 'Why don't the train whistle?' Q. And did that call your attention to whether or not it was whistling, and did whistle, before the danger signal was given? A. It did.

"By Mr. Jenney: I move to strike out all of that, on the same grounds as in my objection. (Motion denied. Exception.)"

I think the evidence was competent for the purpose stated and with the limitation placed upon it. It was not the meaning of the witness, and neither the court nor the counsel on either side understood him as intending to say that the remark, "Why don't the train whistle?" came after the collision, but after and in connection with the words, "Do you suppose the people in that automobile see the train?" The remark was spontaneous and voluntary (drawn out by the situation), and called Mr. Granger's attention to the very fact whether or not the whistle was being sounded or had been sounded at or after rounding the curve and before reaching the crossing. It is true that Mr. and Mrs. Granger were onlookers and not actual participants in the running of either the train or the automobile, but in a sense they were actors by reason of their immediate proximity to the collision, only 800 feet away, and which must have occurred from within 6 to 12 seconds after the train was passing them. The train with engine occupied about one-half the distance from the crossroad crossing to the place of the collision. The fact sought to be shown was, not that

the whistle was not sounded, but the fact whether or not the attention of Granger was actually called to the question whether or not the whistle was being sounded as the engine approached and passed the crossroads crossing. The defendant, by its cross-examination, made the existence of that fact an issue.

Limited as the evidence was to the determination of the question whether or not the attention of Mr. Granger was called to the ringing or nonringing of the bell and nonblowing of the whistle of the engine at the time it approached the crossroads crossing, and whether or not the attention of the witnesses was on the whistle and bell at that time, it became a part of the res gestæ. Judge Thomas, in his work on Negligence, Rules, Decisions, and Opinions, at page 593, says:

"As applied to cases based on negligence, the doctrine of res gesta usually arises respecting evidence of statements, declarations, and expressions made by the injured person, or by a servant of one of the parties, or by third persons standing by. The rule broadly stated is that the character, quality or cause of a tortious act may be explained by exclamations, declarations, or statements coincident with the injury, provided they be calculated to unfold the nature and quality of the acts which they are intended to explain. There must be a transaction of which they are considered a part. They must be concomitant with the principal action and so connected with it as to be regarded as the result and consequence of coexisting motives, and must not have been made as merely narrative of a past occurrence."

Within this broad language, the declaration of Mrs. Granger might be competent on the question: Was the bell rung or the whistle sounded inasmuch as the whistling posts for these crossings were just south of the crossroad crossing where Mr. and Mrs. Granger were, and at which point the engineer testified he sounded the whistle? But that question is not here. The fact sought to be shown was that Granger's attention was on the sounding or nonsounding of bell and whistle, one or both. The exclamation of Mrs. Granger was entirely disinterested, and it was spontaneous (drawn out by the conditions existing), and there was no premeditation, and it was relevant. In Chamberlayne, the Modern Law of Evidence, vol. 4, § 3015, pp. 4186, 4187, the author, citing cases, says:

"Naturally the influence of a particular occurrence said to have created an automatic utterance is far more powerfull, exerted upon the person immediately affected than upon those who have merely seen it. The exclamations of the latter, though obviously competent in an independently relevant capacity, are seldom spontaneous, within the meaning of the rule, and cannot, therefore, be employed as proof of the facts asserted. Should it appear, however, under the circumstances of a particular case, that a given utterance by a spectator was, in point of fact, spontaneous, it is good primary evidence of the fact which it alleges."

And in the same volume (section 2597, pp. 3521, 3522, 3523), the author says:

"The independently relevant statement may be that of a bystander. Wherever it can be fairly inferred that the declarations of such a person affected the action of the participants themselves, in some essential particular, or promoted the doing of some important act, the evidence will be received. The same administrative course is adopted where the exclamation of one standing near is felt to be necessary or expedient for connecting other facts into the narrative of significant events. Statements are not objectionable as hearsay.

"These declarations of bystanders are not offered in their assertive capacity; i. e., as evidence of the facts stated."

In the case at bar this exclamation of Mrs. Granger promoted the important act on the part of Mr. Granger of paying attention to whether or not the bell was being rung or the whistle sounded. The res gestæ was not the mere collision of engine and automobile, but the causes of that collision operating at the time, and it included all that was said and done by the participants and onlookers which was relevant to the issues and spontaneous. Some of the acts and exclamations were relevant for one purpose and some for another; but as said in Chamberlayne:

"A party is not prevented from proving a constituent fact, one of the res gestæ of his case, merely because it is a transaction which in some degree is suggested from the other transactions involved in the res gestæ." Volume 4, § 3249.

And the author also says:

"And it is a well-established principle that the fact that the jury may misuse for purpose X evidence which is perfectly competent for purpose Y furnishes no ground for rejecting evidence absolutely essential to the case of the proponent in connection with purpose X. Evidence of another transaction may be necessary in order to enable a party to prove his case, to detail the res gestæ, the constituent facts upon which he is relying."

Here the foundation of the action was negligence on the part of the defendant railroad company in that it did not give suitable or any signals of the approach of this train to the crossing in question. To show that such signals by bell or whistle were not given, it was necessary to call those bystanders and spectators who were present on the occasion of the collision and especially important, in view of the decisions that the statement of those who were not paying attention is of little weight against the testimony of those who were, to show that Granger's attention was on the question of signals from the engine. The plaintiff was not confined to Granger's mere "say-so," but, in view of the cross-examination tending to show Granger's attention may have been on his own automobile, was entitled to show that his attention was in fact called to that particular question (signals) by voluntary, spontaneous, and relevant exclamations made at the time by one who was also watching the transaction and in a position to hear, see, and know. It was not an opinion or the recitation of a part transaction. The exclamation of Mrs. Granger was a part of the transaction, and drawn out by it.

This question has been decided in a very similar case (Terwilliger, as Adm'x, v. Long Island Railroad Co., 152 App. Div. 168, 172, 136 N. Y. Supp. 733, 736), where the court said:

"It is also urged that the court erred in permitting Mrs. Wilson to testify that she saw the accident and that she exclaimed, just at the moment of the approaching collision: 'Why don't they blow that whistle? The people in that car don't see that train.' The court subsequently struck out the declaration, 'The people in that car don't see that train,' and permitted the remainder of the exclamation to remain; the defendant taking an exception. The issue to be determined was whether the defendant had given any warning on its approach to this crossing, and it was clearly competent for the plaintiff to prove that no whistle was blown, and this witness had testi-

fied that she heard no whistle, and the fact that she made an exclamation at the very crisis of the transaction, referring to the fact that no whistle was blown, seems to us to be competent. It was a fact which showed that her attention was directed to the very matter in issue. It was not evidence of the fact that the whistle was not blown. It was merely a fact showing that the witness, in testifying that she heard no whistle, was testifying to a matter to which her attention was directed at the time, and is not more objectionable than any other statement of fact which would show that she was in a position and in a frame of mind to know whether the whistle was blown or not. If she had testified that she looked to see if there was escaping steam, indicating the blowing of the whistle, it would not have been objectionable. Indeed, this very question was asked and answered by this witness without objection, and we are persuaded that the question objected to was not less open to objection."

[7] There was some evidence tending to show that the engineer, on seeing the automobile on the track, or proceeding onto the track in front of the engine and in danger and appreciating such fact, no warning signal of the approach of the train having been given, was negligent in not then giving signals earlier than he did; that, instead of doing so, he looked to the signal at Caywood station to ascertain whether or not he would have to stop there; and that after this he again turned his attention to the automobile and found it almost immediately in front of him, whereupon he gave the danger signal. If those in charge of the train see a person at a highway crossing approaching the same on foot or in a vehicle or even thereon, they may assume, under ordinary conditions, that the person will stop or get off the track, especially if the view is clear and unobstructed or crossing signals have been given. The rule presupposes that the railroad company has done or is doing its duty to such traveler. But if those in charge of such train see and appreciate that such traveler is unaware of the near approach of the train, and are also negligent in not giving crossing signals, and also see and appreciate that such person is actually in or going in front of the approaching engine (that is, into a place of great peril), led there by the want of signals, especially when there are confusing objects or a confusing situation, it is the duty of such person in charge of the train not only to sound warnings, if he can, but slacken speed, if we can, and avoid doing injury to the traveler. Those in charge of a rapidly moving train approaching a highway crossing without signals and seeing and appreciating that the traveler at the crossing is not aware of his danger and is going in front of the engine in ignorance of its approach may not assume that he will see in time and stop, or will see and get out of danger in time. The duties of those in charge of the train and of the traveler are mutual and reciprocal and under such a state of facts as described it would be negligence on the part of the railroad company not to signal at once and slacken speed, if reasonably possible so to do; that is, avoid doing injury to a person in imminent peril seen and appreciated and brought about by the negligence of the railroad.

[8] The court charged the law at some length on that subject under the evidence in the case; but, when the defendant took its exception and raised the question of the sufficiency of the evidence to present that question under the pleadings, the plaintiff withdrew all claims of negli-

gence on that or those grounds and explicitly elected to stand on the sole ground of negligence in not giving signals of the approach of the train to the crossing, whereupon the court withdrew its charge on that subject and directed the jury to disregard it. The following is what occurred:

"By Mr. Jenney: I except to all that your honor said in regard to the engineer's actions after the automobile was in a position of danger, and your leaving that question to the jury, and what your honor said in regard to a traveler on the highway being led into a trap or place of danger.

"By the Court: I didn't say anything about a trap; I said place of danger.

"By Mr. Jenney: And place of peril, and to the emergency, and error of judgment. As to all of that, none of that had been alleged in the complaint as drawn or by any evidence in the case. This is a proposition which the defendant claims is not in the case at all. I want to have that distinctly understood, and the reason for my exception.

"By the Court: You claim it is not within the issues?

"By Mr. Jenney: Not within the issues of this case.

"By the Court: What do you say, Mr. Williams?

"By Mr. Williams: There is nothing said about it especially in the complaint, and I think, so far as it has any bearing on the case, it is the same question whether they were negligent or whether Martha Emens was negligent. That is all there is to it. I suppose, of course, as your honor charged, that if an engineer sees a traveler in a position of danger, and sees that he cannot escape from that position—

"By the Court: If they led him into it—if the defendant railroad company led him into it?

"By Mr. Williams: Yes. That then the engineer is bound to make such effort as he can to avoid hitting him.

"By Mr. Jenney: And do you claim that question is in this case?

"By Mr. Williams: I don't think it is pleaded directly, in the case. I claim that, so far as it is in the case, it is the same question that is involved in the question of the defendant's negligence, and Martha Emens' contributory negligence, in signaling, and in not seeing the train, as it approached the crossing. There isn't anything in the pleadings on that question. I don't know as there is anything in the case that I claim required the engineer to stop his train before it was too late for him to do it. I think the evidence is—

"By the Court: Then you stand purely upon the question of negligence, in failing to give the signals?

"By Mr. Williams: Yes, sir; we stand on that.

"By the Court: Very well. Then you will disregard what I said on the other questions of negligence, gentlemen of the jury.

"By Mr. Jenney: Your honor charged quite extensively on that subject.

"By the Court: I know I did.

"By Mr. Jenney: I take an exception to that part of the charge.

"By the Court: I strike it out. It isn't in the charge. And I direct the jury to disregard it entirely, as a part of the charge, because plaintiff now elects to stand upon the proposition that the negligence of this defendant was in failing to give the signals on the approach to those crossings. That there was the negligence, and that Miss Emens was free from contributory negligence, and therefore entitled to recover.

"By Mr. Jenney: I want it distinctly understood. The only proposition of negligence in this case to the jury is whether or not those crossing signals were given?

"By the Court: That is what I understand now.

"By Mr. Williams: Yes; that is the question."

The defendant contended on the argument that, notwithstanding this, the fact that any charge on that subject was made and then withdrawn was prejudicial. I think not. It was impressed on the jury that no

such ground of negligence was claimed or in the case or to be considered by them. The presumption is that juries will and do observe and obey the instructions of the court, and this must be so when the party openly and plainly withdraws a claim of negligence on a particular ground.

## Damages.

[9] Are the damages excessive in view of the evidence and statute? Here the damages are for the benefit of the four brothers. See section 1903, Code of Civil Procedure, quoted. Section 1904 of the Code of Civil Procedure reads as follows:

"The damages awarded to the plaintiff may be such a sum as the jury upon a writ of inquiry, or upon a trial, or where issues of fact are tried without a jury, the court, or the referee, deems to be a fair and just compensation for the pecuniary injuries, resulting from the decedent's death, to the person or persons for whose benefit the action is brought. * * * When final judgment for the plaintiff is rendered, the clerk must add to the sum so awarded interest thereupon from the decedent's death, and include it in the judgment. The inquisition, verdict, report, or decision may specify the day from which interest is to be computed. If it omits so to do, the day may be determined by the clerk, upon affidavits."

During the giving of the charge, this occurred:

"By Mr. Jenney: I except to what your honor said on damages, and I ask your honor to charge the jury that the damage, if any, in this case is confined to the amount of the earnings of the plaintiff's testatrix, Miss during the probable duration of her life, such as might be reasonably expected to be received by her brothers, or is the increase in the estate which might have accumulated had she not been killed, but lived the natural of her life, and which estate would have been distributed among her next kin.

"By the Court: That I decline to charge and give you an exception. (Exception.)

"By Mr. Jenney: I ask your honor to charge that in this case there is proof of any actual money loss.

"By the Court: Well, I will charge that. I don't recollect that there is.

"By Mr. Jenney: You charge that there is not; no proof?

"By the Court: I say that, as if there was any actual money loss Mr. Williams would call my attention to it. I think not.

"By Mr. Williams: If they distinguish between money loss and pecuniary loss, why, I think that is so.

"By the Court: I so charge, because I have no recollection. If there was, it was dropped in here in such a way that it escaped my attention.

"By Mr. Jenney: I ask your honor to charge that if the jury find that the next of kin have sustained no actual money loss by reason of the death of Miss Martha Emens, and find defendant negligent, and if she is free from contributory negligence, they may award only nominal damages.

"By Mr. Williams: Well, now, that brings up the question of what the counsel means by money loss. If he means gold and silver scattered on the highway, I can see there is no proof of it.

"By the Court: If that is what you mean, in that sense, you are absolutely— but the statute says 'pecuniary.'

"By Mr. Jenney: I take exception to your honor's modification. And I ask your honor to make the same charge, substituting money earnings for money loss.

"By the Court: That is so indefinite. Put the words together.

"By Mr. Jenney: I ask your honor to charge this: That if the jury find that the next of kin have sustained no actual loss from money earnings by reason of the death of Miss Martha Emens, and find defendant negligent, and that she is free from negligence, they may award only nominal damages.

"By the Court: Why, they may, because the statute says such a sum. I so charge. I have read the statute to them.

"By Mr. Williams: But your honor don't mean that they must.

"By the Court: Why, no. No, they may. It is with them. I cannot tell them what to find."

Also the following:

"By Mr. Williams: I ask your honor to charge that one of the elements of damage in the case which the jury may consider in determining the amount of damage is the probable value of the service which Miss Emens would have rendered, if any, to her brothers during the remainder of their lives in case she had not been killed."

"By the Court: Oh, certainly. (Exception.)"

The court had before charged as follows:

"And now, gentlemen, a word in regard to the damages. If you find that the defendant company was negligent, and that the plaintiff's testatrix, Miss Emens, was free from contributory negligence, and that the negligence of the defendant was the proximate cause of the accident, collision, and consequent injury and death, the death from the injury received in the collision being conceded here, you come to the question of damages, which, as already stated, are confined to such a sum as you, gentlemen of the jury, deem to be a fair and just compensation for the pecuniary injuries resulting from the decedent's death, that of Martha E. Emens, to the surviving brothers, Olin E., Humboldt, Edgar A., and Fred S. Emens. This includes pecuniary injuries sustained up to the present time, and those that you find will be sustained by these brothers in the future. This statute does not limit recovery to exact proof of pecuniary loss. There must be pecuniary loss resulting from the death, but it (the actual loss) is oftentimes incapable of exact proof. Proof has been made here of the age, the health, and the general intelligence of Martha E. Emens, and of her relation to these surviving brothers, and also of their general business and condition in life. She lived with one of these brothers, at the old homestead, where the others, except one in the West, were in the habit of going on Thanksgiving and the holidays, and sometimes in the summer for a vacation, stopping sometimes, and, so far as appears, without charge. All of these things are a proper subject for your consideration, and have more or less of a bearing upon the question of the pecuniary loss sustained by her death, that is sustained by these brothers. No damages can be given for loss of society, or love, or affection. You may give, as pecuniary damages, such sum as you find from the evidence this lady, Miss Emens, would have accumulated from the time of her death, August 28th, during the time she would have lived, but for this accident, and left her next of kin. This is one further element of damage. Of course, you are not to be affected by passion or prejudice against railroad companies or automobiles. You are to decide this case unaffected by any passion or prejudice against railroad companies, or against automobiles. Take it under this evidence, gentlemen, as I know you will, and under the rules of law which I have given you, and determine what the facts are. And in short, if you find that the railroad company was negligent, if you find that Miss Emens was free from contributory negligence, and if you find that that negligence of the railroad company was the proximate cause of this injury, that it was not caused by the negligence of somebody else, then you come to the question of damages. And you are to give such damages (pecuniary damages only) as you believe under the facts proved as to the age of the deceased, her condition in life, situation and condition in life of these brothers, and their relations, as you may find are a just compensation to them for the loss they have sustained through her death."

The charge expressly excluded everything, except pecuniary damages; that is, pecuniary loss by reason of her death.

The deceased, Miss Martha E. Emens, was 45 years of age and unmarried. She lived on the old homestead with one of the brothers,

evidently keeping house, and here the other brothers, except the one in the West, were accustomed to go on occasion and receive attention and entertainment without charge. She was earning something; had earning capacity. There was no proof that she had saved any part of her earnings. In Phœnix Ry. v. Landis, 231 U. S. 578, 34 Sup. Ct. 179, 58 L. Ed. 377, decided by the Supreme Court of the United States, December 22, 1913, the court said:

"It is said further that the court erred in holding that the plaintiff was entitled to recover substantial damages for the benefit of the estate 'without evidence showing or tending to show that deceased had ever saved or would have saved any portion of his earnings.' We have not been referred to any ruling to this effect."

In Murphy v. Erie R. R. Co., 202 N. Y. 244, 245, 95 N. E. 699, 700, the Court of Appeals held:

"The Code of Civil Procedure provides that damages in such actions as this are exclusively for the benefit of the decedent's husband or wife and next of kin (section 1903), and they are to be a fair and just compensation for the decedent's death to the person or persons for whose benefit the action is brought (section 1904). Under these very general provisions of the statute, it has been impossible for the courts to formulate any strict or definite rules for the guidance of juries in estimating damages, and they have, therefore, given the law a broad and liberal construction. Thus, in Ihl v. Forty-Second St. & G. St. F. R. R. Co., 47 N. Y. 317 [7 Am. Rep. 450], where the action was for the benefit of the parents to recover for the death of a child of tender years, it was held that the absence of proof of special pecuniary damage to the next of kin resulting from the death of the child would not have justified the court in nonsuiting the plaintiff, or in directing the jury to find only nominal damages, and in similar cases this court has decided that the statute does not limit the right of recovery to cases in which there is exact proof of actual pecuniary loss. Oldfield v. N. Y. & Harlem R. R. Co., 14 N. Y. 310, and O'Mara v. Hudson River R. R. Co., 38 N. Y. 445, 450 [98 Am. Dec. 61]. It is always proper, and sometimes necessary, to make proof of such facts as the age, sex, health, and general intelligence of the person killed, his relation to the next of kin, and their condition in life. Houghkirk v. President, etc., D. & H. C. Co., 92 N. Y. 219 [44 Am. Rep. 370]; Lockwood v. N. Y., L. E. & W. R. R. Co., 98 N. Y. 523, 526; Matter of Meekin v. B. H. R. R. Co., 164 N. Y. 145, 152 [58 N. E. 50, 51 L. R. A. 235, 79 Am. St. Rep. 635]. All these things have a bearing upon the question of pecuniary loss suffered by those for whose benefit the action may be maintained, and these are the decedent's husband or wife and next of kin."

But in this case we have evidence that there were three brothers, one of whom lived with the sister, and she kept house for him, was living together on the old homestead. She was his housekeeper. Her death was a pecuniary loss to him certainly. The other brothers were accustomed to go there Thanksgiving time and on other occasions. Her death was a pecuniary loss to them. The recovery is for the benefit of all three, and, under the statute, I think it was the duty of the jury to fix in one sum the pecuniary loss of all three. It could not be divided up. It seems to me that the damages were not excessive. The jury is to give such damages as they, under all the proof in the case, think was just and fair. Under the circumstances presented here, it was impossible to prove with any definiteness or certainty what the damages were or to call any witness or witnesses who could estimate

them. I think it was for the jury to fix the damages under all the evidence.

The result is that the motion to set aside the verdict and for a new trial must be denied.