# BALTIMORE & POTOMAC R. R. CO. *v.* LANDRIGAN.

## ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 71. Argued November 10, 11, 1903.—Decided December 7, 1903.

In the absence of evidence to the contrary there is a presumption that one who was killed while crossing a railroad track at night stopped, looked and listened before attempting to cross the track.

Where it appears that it was customary to keep the gates at a railway crossing down during the night without regard to the approach or presence of cars, trains or locomotives, the fact that they are down is not of itself a

warning of the presence of danger to one acquainted with such custom, while crossing the track at a time when the gates were generally down. Where it is an issue in the case whether a man was killed at a crossing by a regular train which he should know was approaching at about that hour, or by a runaway car of which he had no knowledge, and there is evidence on such issue from which reasonable men might draw different conclusions, it is not error to leave it to the jury to determine whether or not it was a want of ordinary or reasonable care and prudence for deceased to attempt to cross the track at the time and under the circumstances, the jury being charged that their verdict should be for the defendant if they found that he had been killed by the regular train.

THIS action was brought under the death statute of the District of Columbia for damages for the death of the husband and intestate of defendant in error. The death was the result of injuries alleged to have been caused by the negligence of the plaintiffs in error. The negligence is alleged to have consisted in the insufficient coupling of the cars of the plaintiffs in error, whereby one broke loose from the others and ran over the deceased, in not equipping the car with good brakes, and not having upon it a light sufficient to give warning of its approach. The answer was not guilty.

The case was tried to a jury, which returned a verdict in favor of the defendant in error in the sum of $6500. This amount was agreed to as correct if the jury should find on the issues for the defendant in error.

Judgment was entered for that amount and costs. It was affirmed on appeal to the Court of Appeals of the District.

The testimony is somewhat long, and we think it is only necessary to give an outline of what it tended to prove to illustrate and determine the questions presented.

The plaintiffs in error operated a steam railroad in the city of Washington, District of Columbia, and maintained four tracks on Virginia avenue southwest, crossing South Capitol street. The most northerly of the tracks, called "The Reservation" or "No. 1" track, was used for freight and shifting purposes. The two intermediate tracks were used for south bound and north bound passenger traffic. The most southerly track was called the "ladder" or "lead track." It was so

called because all the tracks in the railroad yard were connected with it, and all the switches lead into it.    It extended west across South Capitol street to an alley, and terminated at what was known as the property yard, where coal, ties, iron and other commodities were stored.    Gates and a gateman were maintained at the crossing.    There was evidence tending to show that the portion of this track lying west of the crossing was used for storing freight cars, but not passenger coaches, and that no portion lying west was used for shifting or making up the trains; but there was also evidence tending to show that it was so used as occasion required.    Landrigan's body was found at the southwest crossing, south of the "lead track," "but nearer the track than the gate," and there was flesh and blood alongside of the track on its south side.    There was also testimony tending to show that the gates were generally kept down (one witness testified that in his experience they were always down) from ten or eleven o'clock at night until next morning, whether trains were passing or not, and persons with vehicles sometimes found it necessary to request the gateman to raise the gates, and sometimes to wake him up out of sleep for that purpose.    Preceding and at the time of the accident a switching crew was making up a train of cars for the transportation of troops to the south, and it became necessary to "cut out" a Pullman car, called the "Lylete," which was standing on one of the tracks.    Immediately next to it was a tourist car.    It was equipped with a Miller coupler; the Pullman with a Janney coupler.    Both couplers were of the automatic type, but of different patterns, and not designed to couple together, and in order to draw the cars out on the "ladder" track they were coupled together with the ordinary link and pin coupling.

There was considerable testimony as to the manner in which the coupling was done, and of its efficiency, which testimony it is not necessary to detail.    It went to the jury with the other testimony.    It is enough to say that the couplers were of unequal height, and the link could not be put in the slot of

both couplers. It was put in the slot of the Janney coupler, and the other end laid on the top of the Miller coupler, "and the only thing to keep the link from slipping over the head of the pin was a shoulder around the head of the pin." It came loose, and one of the employés, who had been in charge of the train, testified that "the couplings 'slipped around,' he supposed, when they were going around the curve, and that had the tendency to make them come apart; that he supposed it was due to the slack caused by coming over the switch and 'the ladder' track." The "ladder" track had a slight incline to the crossing, and when the car broke loose it started towards the crossing. An employé had tried the brake on the straight track, but when some one "hollared" that the car had broken off he "went to work on the brake again." "It did not seem to catch hold," he testified; and he then "dropped off the end of the car and caught the rear end of it—the head end—and at the same time Hottal (yardmaster) got on the end that he got off of; the witness called for Wilber to help him to put the brake on, and they did all they could to stop the car, but the car had got too much start; the brake seemed to work all right—he did not have any fault to find with the brake, only the car had gotten too much start; he first tried the rear brake and could not get that to work; then went to the other one; while witness and Wilber were working on the forward brake Hottal jumped on and tried to work the rear brake; they did not succeed in stopping the car, because it had gotten too much of a start. He got off at South Capitol street on the southeast side, stood there for a second or two, and then ran after the car to see what damage it had done. There were some other cars down on the end of this track, that this car ran into, and it would not have been safe for the witness to have stayed on the car."

The witness testified that he "did not know Landrigan personally; had seen him a number of times; he saw him after he was hurt; Landrigan's legs were run over, but he could not say whether it was by the car or another train; train No. 78, which

left the depot about 11:55 or 11:35, was passing there about the time of the accident; this train No. 78 is known as the midnight express for New York, and crossed South Capitol street, where Landrigan was hurt, going in an easterly direction; when witness saw Landrigan the latter was lying on the south side of the outside rail of the 'ladder track,' the most southerly track of the four tracks of the crossing; immediately before he saw Landrigan lying there the coach 'Lylete' passed over the crossing at South Capitol street and witness came right along behind this car, after train 78 passed, to see if the coach had done any damage down there and saw Landrigan lying there with some one around him; he went down where the car had stopped and came back and found out what the trouble was." As to the position of the gates, he said: "He first noticed the gates when he came down there after he had jumped off the end of the car; the gates were down then on both sides of the street. He did not notice the gates before 78 passed, because he had not been down that far; he stood on the southeast side of South Capitol street until 78 passed, and then started to run down the main track, and as he ran down the track he noticed that the gates were down on both sides." And further, "the runaway car passed the southwest crossing of South Capitol street before No. 78 reached there; it struck just the middle part of No. 78 as the train came by there; the runaway car had just about gotten across the crossing when the engine of No. 78 began to cross the crossing; it was almost at the same time."

There was a white light in the dome of the vestibule of the runaway car or on the platform, and the effect of the light was testified to as follows by one witness:

"The lamp in the dome of the vestibule of the Pullman car had a white shade or globe underneath; it gave a bright light—you could see it all right; the lamp was inside of the door and the door was closed; the glass in the door extended about half way down, and the light shown through the glass in the door."

By another· witness:

"That the light in the car was in the dome—in the vestibule —just on the outside of the door, over the platform; he knows .there was a light in the west end of the car, the end going toward South Capitol street—which was the front end of the car the way it was moving; this light could be seen more plainly than a lamp; such lights contain two burners, are lighted by oil, and are more brilliant than a lantern·; the reflector is over the top of the light; there is a kind of white shade over them; that the light in the vestibule of the car could be seen by people on the ground; it hung down low, and did not set right up in the dome; it had a shade over it, but he does not know whether you could call it a reflector or not; it was plain enough to be seen by anybody who· was on the ground."

By another witness:

"That the light in the vestibule of a Pullman car is so located as to illuminate the platform only; that is the purpose of that light; that it does not throw the light more than a couple of feet beyond the end of the bumper of the car; it is not intended to illuminate the track.

"And thereupon, on cross-examination, said witness further testified that such a light was not intended for a locomotive headlight; that if a man was standing on the track some distance from the advancing end of a car showing such a light he would not see the source of the light, but would see the reflected light on the platform on the car; he could see the illuminated end of the car; that if he·was not looking exactly in that direction this light would not attract his attention away from something else; that if he were looking up the track he could see the light if he were not too far away."

And the evidence showed "that a Pullman car running along an ordinarily straight track at a rate of speed a little faster than a man ordinarily runs, or can run, does not make any noise."

Landrigan was employed as a machinist and assistant boys on the night force at the round house, which was situated be-

tween H and I streets, on South Capitol street. He had been employed for eight years. His home was north of the railroad tracks on Virginia avenue, and the most usual and direct route to his home from the round house was up South Capitol street to the southwest crossing, "then right over to the north side of Virginia avenue; and it was the way Landrigan usually took." On the night of the accident he left the round house about 11: 50 o'clock, and about twelve o'clock was found in the place and condition described in the testimony. The night "was not a clear night, nor was it a real dark night—there was no moon and there were a few clouds." The crossing was lighted up by street lamps located on each side of the four corners, and there was an electric light in the reservation north of the tracks, and another one south and east of the tracks near the signal tower.

There was testimony to the effect that to a person outside of the gate the flagman's box would "obstruct the view of the ladder track to the east, but one standing on the inside of the gate on the open space, you could look straight up the track to the eastward, and there was nothing to break your view." And also that two freight cars obstructed the view to the west.

There was no eyewitness to the accident, and Landrigan, in response to the inquiry, "How did this thing happen?" replied, "I came under the gates and something struck me, and a whole train of cars ran over me." He died about four o'clock without making further explanation.

At the close of the testimony the plaintiffs in error moved the court to instruct the jury to find a verdict for them. The court refused, and this is assigned as error. The case was then submitted on the evidence of the defendant in error.

Errors are also assigned upon the giving and refusing of certain instructions.

*Mr. Frederic D. McKenney* and *Mr. J. Spalding Flannery,* with whom *Mr. Wayne McVeagh* was on the brief, for plaintiffs in error;

The railroad company cannot, as to the backing up of the Pullman car, be held liable for doing unintentionally what it had a right to do. *Stewart* v. *Washington & Great Falls Ry. Co.*, decided Nov. 4, 1903, by Court of Appeals, Dist. Col.

There is a distinction between remote and proximate causes of an accident. The proximate cause was the passing over the tracks by the plaintiff below while the gates were down. *Insurance Co.* v. *Boon*, 95 U. S. 130; *Scheffer* v. *Railroad Co.*, 105 U. S. 249; *W. & G. R. R.* v. *Hickey*, 166 U. S. 528; *Cullen* v. *Railroad Co.*, 8 D. C. App. 69; *Granger* v. *Boston & Albany*, 146 Massachusetts, 276; *Allerton* v. *R. R. Co.*, 146 Massachusetts, 241; *Schmidt* v. *Phila. & Reading R. R. Co.*, 149 Pa. St. 337; *Debbins* v. *R. R. Co.*, 154 Massachusetts, 402; *Marden* v. *Boston & Albany*, 159 Massachusetts, 393; *Peck* v. *R. R. Co.*, 50 Connecticut, 379; *B. & O.* v. *Colvin*, 118 Pa. St. 230; *Cleary* v. *R. R. Co.*, 140 Pa. St. 19; *Sheehan* v. *R. R. Co.*, 166 Pa. St. 354; *Duvall* v. *Michigan Central R. R. Co.*, 105 Michigan, 386; *Douglass* v. *R. R. Co.*, 100 Wisconsin, 405; 76 N. W. Rep. 356; *Railway Co.* v. *Schneider*, 45 Ohio St. 678; *Railway Co.* v. *Ehlert*, 63 Ohio St. 320.

Either plaintiff did not look or, having looked, he disregarded what he saw. In explaining the occurrence he made no mention of having looked up and down the tracks before venturing upon them, and if his statement is to be accepted at all; it should be accepted as conclusive, and the case should also have been taken from the jury on this ground, for by his reference to a "whole string of cars" he must have meant the express train No. 78; it was conceded that if he was injured by that train he could not recover.

If he did not look and listen before attempting to cross the tracks, or if he looked and failed to heed the warnings of his senses, he was guilty of such contributory negligence as will prevent plaintiff from recovery here. *Northern Pacific R. R. Co.* v. *Freeman*, 174 U. S. 384; *Hook* v. *Mo. Pac. Ry. Co.*, 63 S. W. Rep. 360; 21 A. & E. R. R. Cas. (N. S.) 787.

The true rule in cases of this character is that there is no presumption of law either way or in favor of either party. Beach on Contributory Negligence, § 182; *Missouri Pacific v. Foreman*, 73 Texas, 311; *Phila., W. & B. R. R. Co. v. Stibbing*, 62 Maryland, 504; *Texas & Pacific v. Gentry*, 163 U. S. 353.

One is not entitled to say that he was injured by the negligence of another if he, by the use of ordinary care, might have escaped the damage. *Davey v. London & S. W. Ry. Co.*, 12 Q. B. D. 70 (1883); *Wakelin v. London & S. W. Ry. Co.*, 12 App. Cas. 41 (H. L. 1886); *The Bernina*, 12 Probate Div. 58 (1887); *Sewall v. N. Y., N. H. & H. R. Co.*, 171 Massachusetts, 302; *Grand Trunk Ry. Co. v. Ives*, 144 U. S. 408; *Patton v. Texas Pacific Ry. Co.*, 179 U. S. 658.

*Mr. J. J. Darlington* and *Mr. Charles A. Douglass*, with whom *Mr. Joseph D. Wright* was on the brief, for defendant in error:

The trial judge could not have directed a verdict for defendants below. As to respective functions of judge and jury, see *Douglass v. Railroad Co.*, 100 Wisconsin, 407; *Grand Trunk Railroad Co. v. Ives*, 144 U. S. 408; *Texas & Pacific v. Gentry*, 163 U. S. 353, 369; *Cowen v. Merriam*, 17 App. D. C. 186.

Defendants charge that this contributory negligence which they impute to deceased consisted of two distinct acts on his part: (1) going under the closed gates; (2) failing to look and listen.

Appellants cite many authorities and quote *in extenso* from the opinions of the courts in support of the general proposition that to go under closed gates and on a railroad track constitutes negligence *per se.*

The principle as stated, and when applied to the ordinary case, where the gates are used as signals of danger or safety —danger when closed, and safety when opened—is obviously wholesome and sound.

The gates were kept down all night except when vehicles passed; this was a custom and plaintiff knew of the custom and was entitled to rely upon it as he did. This took plaintiff out of the general rule of what would otherwise have been negligence *per se*; no testimony was offered by defendants below on this point.

Their failure to do so, where the witnesses who operated the gates, and who knew and could have testified better than any one else as to the exact facts, were their own employés, whom they could readily have produced if those facts would have been to their advantage, of itself creates a case for the deduction of inferences that the facts were adverse to them, upon which the plaintiff was entitled to have the jury pass. *Am. Bell Tel. Co.* v. *Nat. Tel. Mfg. Co.*, 109 Fed. Rep. 976, 1018; *In re Kellogg*, 7 Am. Bank. Reg. 635; *Graves* v. *United States*, 150 U. S. 118, 120, 121; *Runkle* v. *Burnham*, 153 U. S. 216, 225.

As to the alleged negligence of passing under the gates when a danger signal thus becomes no real signal of danger, no negligence is to be imputed to the traveler who knows the fact and acts upon it. *Cessante ratione legis cessat et ipsa lex.* A *fortiori*, when a signal ceases to be used for the object for which it was intended, it ceases to indicate that object. *Dashiell* v. *Market Company*, 10 App. D. C. 81, 89; *Douglass* v. *R. R. Co.*, 100 Wisconsin, 405, and *Sheehan* v. *R. R. Co.*, 166 Pa. St. 354, distinguished.

While it is the duty of one before attempting to cross a railroad track to look and listen for the approach of trains, it is equally well settled that in the absence of any evidence to the contrary, it is to be presumed in favor of the deceased that he did so look and listen. *Continental Improvement Co.* v. *Stead*, 95 U. S. 161, 194; *Texas & Pacific* v. *Gentry*, 163 U. S. 353, 366.

It was not error for the court to refuse to charge in the exact language selected by counsel for defendants. *Continental Imp. Co.* v. *Stead*, 95 U. S. 161, 194.

MR. JUSTICE MCKENNA, after stating the case, delivered the opinion of the court.

The correctness of the ruling in denying the motion to instruct the jury to find a verdict for the plaintiffs in error depends upon the correctness of the ruling in granting or refusing the special instructions prayed. The principles embraced in them are but specifications of the legal propositions contained in the motion and upon which its soundness or unsoundness depended. If the ruling of the court was right on those instructions it was right on denying the motion. We proceed, therefore, to the consideration of the propositions embraced in the instructions.

The charge of the defendant in error is that the railroad companies were guilty of negligence. The railroads deny this, and claim besides that the deceased came to his death by his own negligence, or by negligence which contributed to that result. As an element in the question of the entire innocence of the railroad companies there is involved the construction and effect of the evidence in regard to the coupling of the cars and the sufficiency of the light upon the Pullman car to give notice and warning of its approach. In regard, however, to that evidence the instructions of the court are not questioned in this court. No error is assigned on them here, and whatever of argument is addressed to them or to the evidence is intended to show that those acts, even if they were acts of negligence, were not effective causes of the injury of the deceased, but that his own negligence was such cause. The determination of the contentions of plaintiffs in error, therefore, depends upon the question of the negligence of the deceased, and the instructions given in relation thereto. At the request of the plaintiff in the action, defendant in error here, the court instructed the jury as follows:

"1. In the absence of all evidence tending to show whether the plaintiff's intestate stopped, looked and listened before attempting to cross the south track, the presumption would

be that he did. But that presumption may be rebutted by circumstantial evidence, and it is a question for the jury whether the facts and circumstances proved in this case rebut that presumption, and if they find that they do, they should find that he did not stop and look and listen, but if the facts and circumstances fail to rebut such presumption then the jury should find that he did so stop and look and listen. In order to justify them in finding that he did not, all the evidence tending to show that should be weightier in the minds of the jury than that tending to show the contrary.

"2. The jury are instructed that if they believe from the evidence that the gates at the crossing where the deceased received his injury were generally kept down at night from 10:30 or 11 o'clock until the early morning, without regard to the approach or presence of a car, a train, or trains or locomotives, and shall further conclude from all the facts and circumstances of the case that the deceased had knowledge of that fact, then the circumstance that the gates at the intersection of South Capitol street were down at the time of the accident was not of itself a warning to him of the presence of danger, and contributory negligence cannot be imputed to him from that fact alone.

"3. While knowledge by the deceased of the presence of the Fenton engine on the north track or partly upon the South Capitol street crossing and the approach of No. 78 upon one of the central tracks at or near the time of the accident might or would indicate the presence of danger on or near those tracks, it is for the jury to determine upon all the facts of this case whether it was a want of ordinary or reasonable care and prudence upon his part to be upon the south track, at the point upon said last-named track at which they shall find from the evidence the accident occurred."

The defendants, plaintiffs in error here, submitted instructions to the court which were emphatic contraries of the instructions given at the request of the plaintiff, and expressed the law to be that the fact of the gates being down was of itself

a warning to the deceased; and further, if he disregarded the warning, he was guilty of contributory negligence; and that the gates being down, they were "closed or lowered for all trains, cars or engines which were moving or passing or which might move or pass upon all or any of said tracks at said crossing and were a warning of danger which the plaintiff's intestate was bound to heed, and if the jury shall find that the plaintiff's intestate met his death by going under said gates and upon or so near to one of said tracks as to be struck by a car moving on said track, he was guilty of negligence contributing to the accident, and the plaintiff cannot recover in this action."

The following instruction was also prayed:

"It appearing from the uncontradicted evidence in the case that the defendants maintained at all hours of the night a gateman in charge of the gates at the crossing in question, who raised and lowered said gates as occasion might require, and it further appearing from such evidence that such gateman was accustomed to open or raise said gates for the passage of pedestrians or vehicles when it was safe to do so, and it further appearing that the crossing in question being adjacent to the shifting, storage and engine yards of said defendants and between such yards and their passenger and freight stations in the city of Washington, and that the main tracks leading to and from said station also passed over the same, said crossing was an especially dangerous place, the jury are instructed that in the absence of any evidence tending to show that the plaintiff's intestate, upon approaching said crossing and finding the gates between him and the tracks lowered or closed, made any request of the gateman to raise or open the same or submitted any inquiry as to whether any engines, cars or trains were approaching said crossing before he went under said gates and entered upon the crossing within the same and thereby received the injuries which resulted in his death, said intestate was guilty of negligence directly contributing to his own misfortune and the plaintiff cannot recover."

(1.) There was no error in instructing the jury that in the

absence of evidence to the contrary, there was a presumption that the deceased stopped, looked and listened. The law was so declared in *Texas & Pacific Railway Co.* v. *Gentry*, 163 U. S. 353, 366. The case was a natural extension of prior cases. The presumption is founded on a law of nature. We know of no more universal instinct than that of self preservation—none that so insistently urges to care against injury. It has its motives to exercise in the fear of pain, maiming and death. There are few presumptions, based on human feelings or experience, that have surer foundation than that expressed in the instruction objected to. But notwithstanding the incentives to the contrary, men are sometimes inattentive, careless or reckless of danger. These the law does not excuse nor does it distinguish between the degrees of negligence.

This was the ruling in *Northern Pacific Railroad Co.* v. *Freeman*, 174 U. S. 379, the case which plaintiffs in error oppose to *Railway Co.* v. *Gentry*. In the *Freeman* case a man thirty-five years old, with no defect of eyesight or hearing, familiar with a railroad crossing and driving gentle horses which were accustomed to the cars, approached the crossing at a trot not faster than a brisk walk, with his head down looking at his horses and drove upon the track, looking "straight before him without turning his head either way." This was testified to by witnesses. There was direct evidence, therefore, of inattention. There is no such evidence in this case, and the instructions given must be judged accordingly. The court did not tell the jury that all those who cross railroad tracks, stop, look and listen, or that the deceased did so, but that, in the absence of evidence to the contrary, he was presumed to have done so, and it was left to the jury to say if there was such evidence. The instruction was a recognition of "the common experience of men," from which it was judged in the *Freeman* case that the deceased in that case had not looked or listened, and submitted to the jury that which it was their constitutional duty to decide. And there was enough evidence to justify dispute and from which different conclusions could be drawn.

(2.) We think there was no error in the instruction as to the effect of the gates as a notice of danger under the practice of the companies. Indeed, the instruction is so obviously right that argument advanced to support it drops into truisms. ꞏ One thing or condition cannot be any certain evidence of another thing or condition unless they invariably co-exist. Of course, .two things may occasionally co-exist, but this furnishes no argument for plaintiffs in error. It only raises the query, when do the things co-exist, and, making an application to the pending case, when did the closed gates and passing trains co-exist? When were the former a witness of the latter? Always? The testimony answers, no. Between 10: 30 and 11 o'clock at night, until morning, the gates were generally kept down without regard to passing trains. During that time, therefore, they had no more relation to passing trains than the signal tower or any other inanimate object at or near the crossing. Gates at a railroad crossing have a useful purpose. Open, they proclaim safety to the passing public; closed, they proclaim danger; but, it is manifest, if they be open or closed, regardless of safety or danger, they cannot be notice of either. Counsel perceive this and extend their contention to urging that it is the duty of those who want to cross, be they pedestrians or those driving teams, to seek the gateman and not to attempt to cross until he raise the gates.

Those driving teams must do so if they pass at all, and a controversy such as this record presents could not occur as to them. But there are more who walk than ride, and every .time their way is stopped by gates at a railroad crossing must they awake a sleeping gateman, or seek an absent one, or be charged with negligence, and that despite the fact that the practice of the railroad company has made closed gates not necessarily an indication of danger? The contention makes the neglect of duty by the railroad as efficacious as the performance of duty. At times a railroad must have exclusive use of a crossing, but at such times it is its duty to close the gates. The use over it is its duty to open them, and it cannot

neglect that duty and claim the same consequence as if it had been performed. The instructions of the court were very guarded. It told the jury if the gates where the injury occurred were generally kept down at night from 10:30 or 11 o'clock, without regard to the presence or absence of trains, and that deceased had knowledge of that fact, then "the circumstance that the gates at the intersection of South Capitol street were down at the time of the accident was *not of itself* a warning to him of the presence of danger, and contributory negligence cannot be imputed to him from that fact alone."

The italics are ours, and the words italicized put a careful limitation upon the instruction, and, so limited, it was not erroneous.

(3.) It was an issue in the case whether the deceased was struck and run over by the Pullman car or by the passenger express No. 78, and on that issue the court instructed the jury that if the deceased was struck and run over by the passenger express, their verdict should be for the plaintiffs in error. This instruction is complained of. Plaintiffs in error contend that there was no evidence from which it could be determined that it was the Pullman car and not the passenger express train which injured the deceased, and it was error, therefore, to submit the issue to the jury. The action of the court was right. There was certainly evidence on the issue from which reasonable men might draw different conclusions.

As we have already seen, the most direct evidence of the passing of the north bound express was to the effect that "the runaway car passed the southwest crossing before 78 (the passenger express) reached there; it struck just the middle part of No. 78 as the train came by there; the runaway car had just about gotten across the crossing when the engine of 78 began to cross the crossing; it was almost about the same time."

If it be admitted that this leaves the issue in doubt, and justifies no inference, there are circumstances to be considered. If the deceased was struck by No. 78, it is difficult to understand how he got to the place and in the condition he was found.

Was he hurled there by the impact of the train? If that were possible, how came his legs to be crushed? Not by the runaway car, because that had passed; not by train 78, for he had been cast aside and away from that. The circumstances, therefore, seem to indicate that he was not struck by train 78, but was run over by the runaway car, and, we think, there is nothing inconsistent with that conclusion in his statement. His situation was horrible. If in our different situation we may venture to judge of it at all, we may wonder that he had or could retain any preception of what had occurred. Certainly exact accuracy of statement could not have been expected of him, and to his shocked and almost overwhelmed senses it might well have seemed that not one car only, but a train of cars had run over him. Finding no error in the record, the judgment is

*Affirmed.*