## QUEREAU v. LEHIGH VALLEY R. CO.

(District Court, N. D. New York. February 5, 1921.)

**1. Railroads ⟨⟩346(5)—Care on part of driver killed presumed.**

Where an intelligent man of mature years and familiar with the locality was struck by a train and instantly killed, while driving alone in a buggy over a railroad crossing at night, a jury may infer that he exercised the due care demanded by the situation and circumstances, and evidence is required to establish contributory negligence.

**2. Railroads ⟨⟩350(7, 22)—Negligence held questions for jury in action for driver's death.**

In an action for death of a person killed on a railroad crossing, while driving alone on a dark and stormy night by a train going down grade, on conflicting evidence as to the warning signals given and the speed of the train, although it was shown that it ran 1,000 feet after the emergency brakes were applied before stopping, the questions of negligence of defendant and contributory negligence of deceased *held* for the jury.

At Law. Action by Dora E. Quereau, executrix of Wilson R. Quereau, deceased, against the Lehigh Valley Railroad Company. On motion by defendant to set aside verdict and for new trial. Motion denied.

See, also, 251 Fed. 986.

This is a motion made at the close of the trial to set aside the verdict of the jury, which was reasonable in amount, and grant a new trial on the grounds:

(1) That a former judgment of dismissal in the state court in another action between the same parties for the same cause, and on the same facts, substantially, is a bar to this action.

(2) That defendant was not guilty of any negligence which was the proximate cause of the accident and consequent death of Wilson R. Quereau, the plaintiff's testator.

(3) That said Wilson R. Quereau was guilty of contributory negligence, and that his own negligence was the cause of the accident and of his consequent death.

(4) Alleged errors on the trial.

John M. Brainard, of Auburn, N. Y., and Wm. H. Harding, of Syracuse, N. Y., for the motion.

Peter B. Cole and Thomas Woods, both of Syracuse, N. Y., opposed.

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

RAY, District Judge (after stating the facts as above). Wilson R. Quereau was struck and killed by the engine of defendant's passenger train on the evening of October 18, 1915, as he was crossing the railroad tracks at Rude street highway crossing and going east, on the borders of the village of Weedsport, Cayuga Co., N. Y., and said train was approaching and entering said village, coming from the south and proceeding in a northeasterly direction on a down grade, and approaching its passenger station in said village at a speed variously estimated by witnesses at from 18 to 50 miles per hour. It was a dark, stormy night, the winds coming from the westerly, and Quereau was riding alone in a top buggy, with back and side curtains down, which was drawn by one horse. There was no eyewitness to the collision, and, as plaintiff's testator was instantly killed, what occurred is matter of inference from the known and proven facts, showing the situation and conditions and what preceded and was found after the accident. It was claimed, and the jury found, that the defendant was negligent in either failing to give signals of its approach to the crossing, or in its rate of speed, or in both respects.

Almost immediately after the accident the dead body of Quereau and that of the dead horse were found on the embankment on the east side of the track and about 30 feet distant therefrom, and 2 or 3 rods north of the crossing; but the vehicle had been taken up by the pilot of the engine and actually carried thereon up to Graham street. This indicates that the horse was clearing the tracks at the moment of the collision, and that the buggy was then on the tracks. When last seen, Quereau was on Horton street, 275 feet from, and was approaching, the crossing. He was then on Horton street, which intersects and enters Rude street about 70 feet from the crossing. His horse was walking, and there was nothing to indicate he was in a hurry. He had no infirmity of body or mind, and as he had lived in the village some years and was an active business man, it is fair to assume, and the jury would have been justified in finding, as it undoubtedly did, that he was reasonably familiar with this crossing. Rude street runs east and west, and Seneca street crossing the next street crossing south, is substantially parallel therewith, and is 635 feet south therefrom. A cut, known as Pile Cut, through which defendant's railroad runs, is some 1,640 feet south from Rude street, at which place there is a curve in the railroad tracks. On the westerly side of the railroad tracks, south of Rude street, there were obstructions preventing a clear view of the tracks, except at intervals; but, when within 25 feet of the crossing, approaching it from the west on Rude street, as Quereau was doing, a person in the daytime could see as far south as Seneca street. At a point in Rude street 54 feet west of the first rail of the railroad track a person could first see the head of an engine approaching from the south when 294 feet away. At a point in the roadway of Rude street 35 feet 8 inches from the west rail of the track a person could first see the head of an engine approaching from the south at a distance of 474 feet.

The highway approach to the Rude street crossing from the west was difficult, in that the roadway was on a narrow unfenced embank-

ment, with sloping sides, rising from the intersection of Rude and Horton streets to the railroad tracks, which were on a fill 12 feet above the level of such streets and this fill extends both easterly and westerly. There were no street lights and no lighted buildings to illuminate the roadway or crossing, and hence a due regard for safety would demand that the traveler on the highway pay considerable attention to his driving and "watch out" that he kept in the traveled part of the highway. The space between the rails at this crossing was planked, and the planking extended a little on the outside of the rails, and was elevated about 3 or 4 inches above the roadbed. There was no flagman or gates or bell or gong signal of approaching trains at this crossing. As plaintiff's testator drove along and out of Horton street into Rude street, his view south was obstructed by a house on the southwest corner of Rude and Horton streets, and some orchard and other trees beyond. The foliage was dense at this time.

There was a sharp dispute on the trial as to the speed of the train and as to the giving of signals, when and where, and the character of those given. The evidence disclosed that there were other railroads running into and through Weedsport, and at such points that the deceased would have heard whistle signals given by locomotives running or even standing thereon, but not from the same direction as the ones coming from the south on defendant's road. The Erie Canal, on which barges and boats having steam whistles were in operation, was within plain hearing distance. The locomotive drawing the train on defendant's road, and which struck Quereau on the night in question, had been equipped by the locomotive engineer in charge of and running it with a steamboat whistle, which emitted a different sound from the ordinary steam locomotive whistle; that is, gave a low, sullen sound, and not the sharp or shrill sound of the locomotive engine in general use, and the plaintiff claims that, in view of the fact that steamboat whistles were in use on the canal, not far distant and within plain hearing distance, the plaintiff's testator would not necessarily be warned, and was not warned, of an approaching train or locomotive on defendant's road by this steamboat whistle on the locomotive, even if sounded; that it was confusing and inadequate and misleading.

It was the duty of Mr. Quereau to approach this crossing with care, and the greater care in view of the darkness, wind, rain beating on the covering to his carriage, and obstructions to his view, the existence of which it must be assumed he knew. The greater the danger, the greater the care demanded. If Quereau was impressed, or in view of the conditions and surroundings at the time in question, in the exercise of due care and caution, ought to have been impressed and would have been impressed, with the fact that there was danger in proceeding, it was his duty to stop until the presence or absence of danger in proceeding was ascertained. If, in view of the surroundings and conditions, he was impressed with a doubt as to the safety in proceeding, it was his duty to stop until such doubt was resolved in favor of safety. Otherwise he was not bound as matter of law to actually stop, but it was his duty to proceed with care, and to be on the alert and look and listen, and to look and listen with care and intelligently;

that is, with his brains and reasoning faculties, as well as with his eyes and ears. It must be taken for granted that he knew this train was due at about this time, and hence the greater care and watchfulness was demanded.

[1] On the other hand, Mr. Quereau was alone and is dead, and on the trial could not tell what he did or failed to do. Under such circumstances the same degree and amount of evidence as to care on his part was not required. The jury may presume or infer that a man of intelligence and mature years, and familiar with the location and dangers, would have been impelled and actuated by a desire to live and avoid danger and injury, and would have exercised that due care demanded by the situation and circumstances. In such a case as this, to establish contributory negligence, there must be evidence of facts or circumstances showing that the deceased failed to exercise that degree of care required by the law.

In Texas & Pacific R. Co. v. Gentry, 163 U. S. 353, 366, 367, 16 Sup. Ct. 1104, 1109 (41 L. Ed. 186), the court said and held:

"As already stated, no one personally witnessed the crossing of the track by the deceased, or the running of the flat car over him. Whether he did or did not stop, and look and listen for approaching trains, the jury could not tell from the evidence. The presumption is that he did; and if the court had given the special instructions asked, it would have been necessary to accompany it with the statement that there was no evidence upon the point, and that the law presumed that the deceased did look and listen for coming trains before crossing the track.

"In Continental Improvement Co. v. Stead, 95 U. S. 161, 164, the court, speaking by Mr. Justice Bradley, upon the subject of the relative rights and duties of a railroad company and the owner of a vehicle crossing its track, said: 'Those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen; and hence it will not be presumed, without evidence, that they do not exercise proper care.' This principle was approved in Baltimore & Ohio Railroad v. Griffith, 159 U. S. 603, 609. Manifestly it was not the duty of the court, when there was no evidence as to the deceased having or not having looked and listened for approaching trains before crossing the railroad track, to do more, touching the question of contributory negligence, than it did, namely, instruct the jury generally that the railroad company was not liable if the deceased by his own neglect contributed to his death, and that they could not find for the plaintiffs unless the death of the deceased was directly caused by unsafe switching appliances used by the defendant, and without fault or negligence on his part."

In Baltimore & Potomac R. R. Co. v. Landrigan, 191 U. S. 461, 473, 474, 24 Sup. Ct. 137, 140 (48 L. Ed. 262) the court said and held:

"There was no error in instructing the jury that, in the absence of evidence to the contrary, there was a presumption that the deceased stopped, looked and listened. The law was so declared in Texas & Pacific Railway Co. v. Gentry, 163 U. S. 353, 366. The case was a natural extension of prior cases. The presumption is founded on a law of nature. We know of no more universal instinct than that of self-preservation—none that so insistently urges to care against injury. It has its motives to exercise in the fear of pain, maiming, and death. There are few presumptions, based on human feelings or experience, that have surer foundation than that expressed in the instruction object-

ed to. But, notwithstanding the incentives to the contrary, men are some-
times inattentive, careless, or reckless of danger. These the law does not
excuse, nor does it distinguish between the degrees of negligence."

[2] It being presumed that Quereau stopped, looked, and listened,
it might be inferred and found by the jury that he did not drive care-
lessly and recklessly in front of the approaching engine. A question
of fact was presented for the determination of the jury. All the facts
bearing on that question were for the consideration of the jury and
its determination. In the face of the presumption, and in the ab-
sence of evidence on the part of the plaintiff overcoming it, it was
for the defendant, by direct evidence or by proof of facts and cir-
cumstances, to show that Quereau did not look and listen intelligently
and carefully. It may be argued that the train was in plain sight
when Quereau should have stopped, looked, and listened, and that
if he did he must have seen the approaching train, and that this is
convincing and determinative proof, either that he did not look and
listen, or that, if he did, he carelessly and recklessly drove in front of
the approaching engine. The law does not, in the United States courts,
fix the precise distance from the railroad tracks at which, or within
or without which, the traveler on the highway, in the nighttime and
in the midst of a storm, or at any time, must stop, look, and listen, or
look and listen.

This was a dark, stormy night, with a heavy wind blowing. The
rain was beating on the cover of the buggy. There was no artificial
light. The highway ran east and west, the railroad tracks northeast and
southwest, forming an acute angle, and this placed the approaching
train to some extent, as Quereau approached the tracks, behind him.
The train was running with steam off on a down grade. If the horse
was walking at the rate of say 2 miles per hour, it moved 3 feet per
second, and if the train was running say 30 miles per hour, it was
making 44 feet per second. If Quereau stopped 35 feet, or 2 rods,
from the west rail, and saw nothing, and was 12 seconds in getting on
the track, it shows the train when he stopped was 528 feet away, run-
ning at 30 miles per hour, and out of sight. It may be the jury found
that on account of the storm Quereau could not and did not hear the
rumble of the train. Quereau could not constantly look in one direc-
tion. It was his duty to look in both. In the darkness he may have
miscalculated his distance from the tracks when he did stop, and may
have stopped too soon. In view of all the conditions and surroundings,
I think the question of contributory negligence was for the jury.

Was the defendant railroad company, or its employees engaged in
operating this train, guilty of negligence which was the proximate
cause of the accident and resulting death? Was there evidence to jus-
tify a finding of such negligence? The contention of the plaintiff
was and is that defendant was negligent in running its train at this
place, under the circumstances and conditions known to it, at an ex-
cessive rate of speed, and that it failed to give adequate signals or
warnings of its approach. The defendant well knew of the existence
of this highway crossing, and was bound to apprehend that travelers
on the highway might be there about to cross, or in the act of cross-

ing, as its train approached. It was therefore under obligation to run its train at a reasonable rate of speed as it entered the village and crossed streets, and with reasonable precautions, giving reasonable signals of its approach, to the end that such travelers might keep off the tracks, if approaching, or being thereon get off and out of the way of the approaching train.

In Continental Improvement Co. v. Stead, 95 U. S. 161, 164 (24 L. Ed. 403), Mr. Justice Bradley gave the holding of the court as to the mutual rights and duties of railroads and travelers at highway crossings, and this was cited, quoted, and approved by the Supreme Court in Baltimore & Ohio R. R. Co. v. Griffith, 159 U. S. 603, 608, 609, 16 Sup. Ct. 105, 107 (40 L. Ed. 274), Mr. Justice Bradley said:

"If a railroad crosses a common road on the same level, those traveling on either have a legal right to pass over the point of crossing, and to require due care on the part of those traveling on the other to avoid a collision. Of course, these mutual rights have respect to other relative rights subsisting between the parties. From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it cannot be expected that it shall stop and give precedence to an approaching wagon to make the crossing first. It is the duty of the wagon to wait for the train. The train has the preference and right of way. But it is bound to give due warning of its approach, so that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way. Such warning must be reasonable and timely. But what is reasonable and timely warning may depend on many circumstances. It cannot be such, if the speed of the train be so great as to render it unavailing. The explosion of a cannon may be said to be a warning of the coming shot; but the velocity of the latter generally outstrips the warning. The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train. In such cases, if an unslackened speed is desirable, watchmen should be stationed at the crossing.

"On the other hand, those who are crossing a railroad track are bound to exercise ordinary care and diligence to ascertain whether a train is approaching. They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen, and hence it will not be presumed, without evidence, that they do not exercise proper care in a particular case. But, notwithstanding the hazard, the infirmity of the human mind in ordinary men is such that they often do manifest a degree of negligence and temerity entirely inconsistent with the care and prudence which is required of them, such, namely, as an ordinarily prudent man would exercise under the circumstances. When such is the case, they cannot obtain reparation for their injuries, even though the railroad company be in fault. * * *

"For, conceding that the railway train has the right of precedence of crossing, the parties are still on equal terms as to the exercise of care and diligence in regard to their relative duties. The right of precedence referred to does not impose upon the wagon the whole duty of avoiding a collision. It is accompanied with, and conditioned upon, the duty of the train to give due and timely warning of approach. The duty of the wagon to yield precedence is based upon this condition. Both parties are charged with the mutual duty of keeping a careful lookout for danger; and the degree of diligence to be exercised on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring fairly to perform his duty. * * *

"The mistake of the defendant's counsel consists in seeking to impose upon the wagon too exclusively the duty of avoiding collision, and to relieve the train too entirely from responsibility in the matter. Railway companies cannot expect this immunity, so long as their tracks cross the highways of the

country upon the same level. The people have the same right to travel on the ordinary highways as the railroad companies have to run trains on the railroads."

And see Delaware, Lackawanna, etc., Railroad v. Converse, 139 U. S. 469, 472.

The defendant could not rely wholly on the rumble of its train as an adequate warning, nor on the mere ringing of the bell, which could be heard a short distance only with a wind blowing across the track and against the approaching train. And, said Mr. Justice Bradley:

"The speed of a train at a crossing should not be so great as to render unavailing the warning of its whistle and bell; and this caution is especially applicable when their sound is obstructed by winds and other noises."

In the instant case the wind was blowing against the approaching train, carrying the sound of bell and whistle, if given, away from Mr. Quercau. The direction of the wind was known, or ought to have been known, to the engineer of the approaching locomotive. The obstructions on the westerly side of the track were known to him, for they were of a permanent character. He was also fully aware of the existence of these streets a few hundred feet apart in the village and on its outskirts, and of the elevation of the tracks and the character of this crossing. Said Mr. Justice Bradley:

"Both parties are charged with the mutual duty of keeping a careful lookout for danger; and the degree of diligence to be exercised on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring fairly to perform his duty."

And, again, said the learned justice:

"The right of precedence (in the railroad) referred to does not impose upon the wagon the whole duty of avoiding a collision. It is accompanied with, and conditioned upon, the duty of the train to give due and timely warning of approach."

The warning by bell or whistle is to be given at a time and distance from the danger point when and where it will be likely to avail, and it must be of a character likely to accomplish its purpose; such as a reasonably intelligent and prudent man would honestly believe would accomplish the purpose, all the known circumstances and conditions being considered.

In the instant case there was a sharp conflict in the evidence as to when and where signals were given and as to their character, as well as to the speed of the train. Witnesses are apt to honestly vary and conflict in giving estimates as to the speed of a moving train. The value of their testimony on such a point, conceding their honesty, depends largely on their intelligence, experience in such matters, opportunity for seeing and observing, and on whether or not their attention was called at the time to the speed of the train. It is also important whether their attention was called very soon after the occurrence to what they saw and observed, or a long time afterward. Persons who were seated in their homes, and who had no concern with whether or not a train passed close by and within plain and conceded hearing dis-

tance, and whose attention was not called to whether it passed or not, or signaled or not, until a considerable time thereafter, and who testify they did not hear the train or signal therefrom, carry little, if any, weight as against positive testimony that the train did pass and sound signals, when given by those who were interested and observing. Of course, the credibility of the witnesses is to be regarded. Other witnesses who were seated in their homes, and who were accustomed to watch and listen for trains, or a particular train, and who say they were observing as usual at the time, may testify, and their evidence is of weight.

In the instant case witnesses who were outside and observing this train testify as to what they saw and heard. It may be considered as positively shown that the whistle was sounded at Pile Cut, about 1,600 feet south of Rude street; but this might not be adequate warning to a person on Horton street, approaching Rude street. Proceeding south along Horton street, and before turning into Rude street, Quereau could have glimpses of the coming train, if he looked or was looking at the necessary points; but, generally speaking, his view and his hearing were obstructed by the intervening trees and buildings, and at some points by the make of the ground.

The testimony is in serious conflict as to the giving of signals by this train from the time of, or after, leaving Pile Cut. It was for the jury to settle this conflict. So of the speed of the train, estimated all the way from 18 or 20 miles per hour to 50 miles per hour. An estimate as to the speed of a train, made by a person having no well-grounded qualifications to form and give a reasonably accurate estimate, is of little or no value in such a case as this; but in this case the most of the witnesses showed that they had ability in this regard. Their qualifications in the matter were for the jury. The engineer of the train, whose duty it was to be on the lookout ahead, says he did not see the horse and wagon, or Quereau, until within about 10 or 12 feet of them.

The headlight threw its glare far ahead, at least about 200 feet, and the engineer could see from 50 to 100 feet ahead along the side of the engine. Immediately on seeing the horse and buggy, he applied the emergency brakes, but was unable to stop the train until something like 1,000 feet northeast of the crossing. All this is pertinent evidence bearing on the speed of the train, and tends to corroborate to some extent the evidence given in behalf of the plaintiff as to the speed. Certain of the witnesses, paying attention, testified to hearing the whistle, but said the sound heard was a far-away and faint sound. Some of the witnesses called by the plaintiff were on high ground to the east of these railroad tracks, and consequently better able to see and hear. They were not interested in the result. Many of defendant's witnesses, not all, were in the employ of defendant, and this indirect interest, if any, was for the consideration of the jury.

The presumption that Quereau exercised care in crossing the railroad is rebuttable, and may be rebutted by evidence showing that, if he looked, he must have seen the approaching train, and that, if he listened, he must have heard it; but the evidence in this case is not

270 F.—53

satisfactory or sufficient in either respect. It was not such as to present a question of law for the decision of the court, but left both questions a question of fact for the jury, and its decision was in favor of the plaintiff and should not be disturbed.

The remaining question is: Is the judgment in the state court res adjudicata here? That is, was it a judgment on the merits? If so, it is binding and conclusive; otherwise, not.

The question of the effect of that judgment in the state court was fully and carefully considered by this court on the trial, as it was presented and raised by the defendant at the close of the evidence, and after the record of that trial had been put in evidence by the defendant. The opinion of this court on that question thus presented will be found in 251 Fed. 986, and on reflection and further examination I find no sufficient reason for changing my opinion. The provisions of the Code of Civil Procedure of the state of New York there cited seem to determine this question. In the suit in the state court the plaintiff did not ask for the direction of a verdict, but stood upon the evidence, and therefore there was no submission of the case on the evidence presented to the decision of the court, and no waiver of a jury trial. The plaintiff in the state court requested to go to the jury, and insisted on its right to do so. Reference is made to the opinion of this court in 251 Fed 986, without further going into the reasons there given; and being of the opinion that the question of defendant's negligence and of plaintiff's contributory negligence were for the jury, and that the judgment in the state court dismissing the complaint was not a judgment upon the merits but a nonsuit merely, the motion to set aside the verdict of the jury and grant a new trial is denied.

There will be an order accordingly.