**Ray CONNER, Administrator of the Estates of Esther Benedetto, Emily D'Ascenzo, Joseph D'Ascenzo, Jr., and Donna D'Ascenzo, Deceased,**

v.

**The PENNSYLVANIA RAILROAD COMPANY.**

**Civ. A. 20572.**

United States District Court
E. D. Pennsylvania.
June 23, 1958.

———◆———

Edward W. Furia, of Furia & Di-Cintio, Philadelphia, Pa., for plaintiffs.

Robert Landis, of Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., for defendant.

GRIM, District Judge.

A three-car electric suburban passenger train of the defendant struck an automobile at a grade crossing and killed four people [1] who were passengers in the automobile. These actions arise out of their deaths. The driver of the automobile was also killed, but is not involved in these actions.

The collision occurred January 31, 1956, at 3:18 p. m. in Secane, Delaware County, Pennsylvania, where the two-track West Chester branch of the railroad crosses Bishop Avenue. Coming from the south, the first track encountered is for eastbound trains and the second for westbound. The tracks are straight for more than 3,000 feet east of Bishop Avenue (P–24, 25). The train was westbound on the second track and the automobile was going north on Bishop Avenue.

Bishop Avenue at the crossing has an asphalt surface about 20 feet wide and shoulders on each side of the asphalt. In the east shoulder, 26 feet 8 inches south of the nearest rail of the eastbound track and 39 feet south of the nearest rail of the westbound track (R. 85), is a metal standard having at its top a crossbuck bearing the words "Railroad Crossing", below it a plate with the words "2 Tracks", below that a horizontal cross-arm bearing at each end red electric lights, two facing south and two facing north, and near the bottom a sign reading "Stop On Red Signal." A similar standard stands in the west shoulder of Bishop Avenue north of the crossing.

The lights are called blinker lights. When operating, one light in each pair is turned on for a few seconds and goes out, whereupon the other light of the pair is turned on for a few seconds and goes out. The lights in each pair thus light alternately. The blinker lights on both standards work at the same time, so that a person approaching the crossing can see lights flashing on both standards. The blinker lights are put into operation automatically when a train on the westbound track arrives at a point 2,845 feet east of the crossing (R. 322). The lights go out when the train clears the crossing. There is no bell, crossing watchman, or safety gate.

On the date of the collision a total of 74 trains traversed the crossing, half eastbound and half westbound (R. 78). During the morning and evening rush hours (7:30–10:30 a. m. and 4:30–7:30 p. m.) shortly after the collision, surveys showed that some 2,100 automobiles traversed the crossing daily.

There was evidence that the blinker lights at Bishop Avenue sometimes operated for periods of a number of minutes without the appearance of trains at the crossing, but there was no evidence that the driver of the automobile knew of this (R. 207).

Persons approaching the Bishop Avenue crossing from the south have a very limited view down the tracks to the right. On the south side of the crossing there is a two-story dwelling 46½ feet east of the east side of Bishop Avenue and 46½ feet south of the nearest rail of the eastbound track (R. 85, 86). There are a total of three steps up from the sidewalk to the front door of the house (P–11, or P–3 plus P–7). Near the northwest corner of the house stands an evergreen tree as high as the top of the first floor window. The width of the foliage on the tree is three-quarters of its height. North of this house and parallel with the tracks there is a row of shrubs and small trees. The highest of these stands about 11 feet

---

1. A two-year old child, a four-year old child, their mother, and their maternal grandmother.

above the roadbed of the railroad and 14 feet south of the nearest rail of the eastbound track (R. 86). At the time of the accident it was possible, from a point south of the blinker light, to get a limited view of the railroad through gaps in the shrubbery (R. 92.). When the eye is in Bishop Avenue in line with the row of shrubbery, looking eastward, it can see little more than five rail lengths of the westbound track (P-10). Sitting in an automobile moving northward toward the crossing, the first unobstructed view of the railroad to the right appears when the front bumper is at a point two feet south of the first of the four rails of the crossing.

There is a whistle board 895 feet east of the crossing (R. 74), at which it is the duty of engineers of westbound trains to begin the standard four-blast whistle signal (two longs, a short, and a long) to warn of their approach to the crossing (R. 421).

The weather at the time of the collision was clear and dry.

Each car of the train had its own propulsion machinery and air brakes. There was no separate locomotive.

Plaintiff's decedents were in a Pontiac sedan riding northward on Bishop Avenue toward the crossing. The blinker lights were operating (R. 159, 167), indicating the approach of a train. The Pontiac came to a stop beside the blinker light standard south of the crossing. At this time the adult passengers in the Pontiac were engaged in an animated conversation, with gestures, which continued until the collision (R. 170, 182). The Pontiac then proceeded forward a foot or two and stopped, and repeated this "inching movement" several times until it arrived almost at the eastbound track (R. 160, 161). From a stopped position there, it started up and proceeded across both tracks, attaining a moderate speed (R. 176). As it straddled the westbound track the train struck it broadside (R. 162) and demolished it. The front of the train, with the automobile adhering to it and sliding on the rails (R. 444) came to a stop 525 feet west of Bishop Avenue (R. 454).

The train had made a stop at Primos station, some 2,855 feet east of Bishop Avenue. It proceeded normally, gathering speed until it was traveling at a speed of 50 miles per hour (R. 510). At the whistle post east of Bishop Avenue the engineer began the four-blast signal for the crossing (R. 509). When he was 150 feet from the crossing he saw the Pontiac moving toward the tracks (R. 514), and immediately let go of the control lever, which had the effect of an immediate emergency brake application (R. 515).

The jury in this case returned a verdict for the defendant railroad company, and the plaintiff has moved for a new trial.

 The basis of the plaintiff's case is, as it must be, that the deaths were the result of the defendant's negligence. There is no issue of contributory negligence on the part of the decedents. The two children, because of their age, were incapable of negligence, contributory or otherwise, and there was no evidence of facts indicating that the adult passengers had any right or power to control the operation of the automobile, Anstine v. Pennsylvania R. Co., 1941, 342 Pa. 423, 430, 20 A.2d 774. In addition, the deceased passengers have the benefit of the presumption that they exercised due care.

 One of the plaintiff's averments of negligence is that under the circumstances defendant failed to give adequate and timely warning of the train's approach, and particularly so in the light of the number of trains passing over the crossing, the number of automobiles traveling on Bishop Avenue, the speed of the trains, and the urban character of the area in which the crossing is situated. In considering the facts it must be borne in mind that defendant, having the verdict, is entitled to have the evidence viewed in the light most favorable to it.

The warning of the train's approach consisted in the main of two things: the

whistle signal and the flashing red lights. Defendant's evidence shows that the whistle signal began when the train, moving at 50 miles per hour, came to the whistle post 895 feet east of the crossing. Since 50 miles per hour is 73⅓ feet per second, this means that the whistle signal began at least 12 seconds before the train got to the crossing. The red lights were flashing on the southern blinker light standard when the automobile was stopped beside it, and at that time the red lights were flashing on the standard on the north side of the crossing, in plain view of the driver. Combined with the sign "Stop on Red Signal", these flashing lights constituted ample warning to the stopped driver that a train was coming.

Plaintiff makes much of evidence which tends to show that the blinker lights flashed at times when there were no trains coming and argues that this excessive flashing without the promised consequence amounted to inadequate warning, as in Baltimore & Potomac Railroad Co. v. Landrigan, 1903, 191 U.S. 461, 24 S.Ct. 137, 48 L.Ed. 262.

The trial judge removed this element from the case by affirming defendant's 32nd point for charge:

"I charge you that you should disregard entirely the evidence that on other occasions the blinker lights at Bishop Avenue might have operated excessively or at times when a train was not immediately approaching. There is no evidence that these facts, if they are facts, had anything to do with the happening of this accident. You should therefore give no consideration whatever to all of this evidence."

Plaintiff assigns the affirmance of this point as error.

There is no evidence to show that the driver of the car or his passengers knew that there was anything unusual, excessive or defective about the operation of the blinker lights.

The nub of plaintiff's argument is that by blinking at times when trains did not come, the railroad cried wolf, like the boy of whom Aesop tells, who gave his neighbors so many false warnings that they did not believe one which was true.

The analogy fails, however, because these warnings (if they were in fact excessive) would not be false warnings to one who did not know them to be such. Stewart v. Norton, 1951, 6 N.J. 591, 80 A.2d 111. As to this driver (and the passengers) the flashing of the lights was a perfectly valid warning, confirmed by subsequent events, that a train would arrive at the crossing in a short time. Excessive operation of the lights, if it did occur, had no causal connection with this collision.

It is this lack of knowledge of defective or abnormal operation of grade crossing warning signals that distinguishes this case from the Landrigan and similar cases, where it was clear that the person on the highway frequently used the crossing and was familiar with the fact that the warning signals at the crossing operated for long periods irrespective of the movement of trains.

In finding for the defendant the jury found that adequate warning was given. Such a finding is clearly supported by the evidence. In view of the whistle and blinker light warnings the jury was amply justified in finding that whatever it may have been that caused this collision, it was not negligence on the part of the defendant by reason of any failure to give adequate warning.

As an additional ground for a new trial plaintiff contends that the court did not charge properly in reference to the effect of possible excessive speed of the train. The answer to this is that there was no evidence of excessive speed on the part of the train. The railroad had placed a limit of sixty miles an hour on its trains at the place of the accident. Under the evidence the highest rate of speed of the train was fifty miles an hour. There is no speed limit imposed on trains by law as there is on motor vehicles on public highways. There is no law which requires that a train be op-

erated at such a speed that it can stop if a motor vehicle appears suddenly in front of it at a grade crossing. The only relationship of speed to the present case comes from its connection with the warning of the train's approach. In reference to this, the charge of the court was:

"Railroad trains, as we all know, sometimes travel at high speed. This high speed may be quite proper, but because of it and the great weight of a train it makes the crossing of railroad tracks by vehicles at grade crossings quite a dangerous thing. Because of the dangers involved in the use of grade crossings the law imposes upon railroads a duty at such public crossings to give adequate warning to users of the crossings of the approach of trains. This duty to give a warning varies with the circumstances at each crossing, because some crossings may be more dangerous than others. The law says in somewhat general terms that it is the duty of a railroad at grade crossings to give timely and sufficient warning of the approach of trains, taking into consideration the circumstances of each crossing, such as the physical characteristics of the crossing, the ability of the travelers to see an approaching train, the rate of speed of the train and the amount of vehicle traffic at the crossing."

This properly and adequately covered the problem of the speed of the train at the Bishop Avenue crossing.

Plaintiff complains of the fact that during the trial one of the jurors expressed to several others the opinion that the Bishop Avenue crossing was "not dangerous unless you are careless." During the voir dire this juror and another answered that they were familiar with the crossing. It is entirely likely that a person having knowledge of something will have an opinion about it, and it is equally likely that, having an opinion, he will express it. Such things are the natural and probable consequences of knowledge. It is too late for plaintiff, having known that two jurors were personally familiar with the crossing, having had advance warning of this knowledge, and taking the chance involved in accepting this knowledgeable juror, to come in now and complain of him.

Plaintiff complains that because the jury reached a verdict in less than 30 minutes, after a five-day trial, it exhibited a capricious disregard of the evidence, and particularly since the jury had the exhibits for an even shorter time. As to the exhibits, it should be noted that the jury carefully examined many of the important ones during the trial. As to the verdict itself, the jury apparently did not have much trouble in agreeing upon it. The fact that a jury reaches a conclusion quickly and easily does not necessarily indicate that it has acted capriciously or has disregarded the evidence. The jury heard the evidence, much of it repetitive, and reached a conclusion which, being quite consistent with the evidence, did not necessarily require prolonged deliberation. Having reached that conclusion, there was no further issue for it to resolve. There is in this no capricious disregard of evidence.

Plaintiff's other reasons for new trial have been considered but are without merit.

Plaintiff's motion for new trial will be denied.